## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **JOEL VANGHELUWE, ET AL.,** | Case No. 2:18-cv-10542-LJM-EAS |
| Plaintiffs, | Hon. Laurie J. Michelson |
| v. | Mag. Elizabeth A. Stafford |
| **GOTNEWS, LLC, ET AL.,** | |
| Defendants. | |

### DEFENDANT PAUL NEHLEN'S FOURTH MOTION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 12(B)(2) AND 12(B)(6) (ORAL ARGUMENT REQUESTED)

NOW COMES Defendant Paul Nehlen ("Nehlen"), by and through Attorney Kyle J. Bristow of Bristow Law, PLLC, and hereby propounds upon the Parties of the instant civil action and this Honorable Court Defendant Paul Nehlen's Fourth Motion[1] for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6):

1. Pursuant to LR 7.1(a)(2)(B), a meet and confer occurred on May 22, 2018, by telephone, during which the undersigned attorney spoke with Attorney Andrew B. Sommerman, the instant motion was discussed, and the relief requested by Nehlen as set forth herein was denied.

2. The Court lacks personal jurisdiction over Nehlen, and the case should be dismissed against Nehlen in accordance with Fed. R. Civ. P. 12(b)(2) for the reasons set forth in the attached Brief.

---

[1] Plaintiffs Complaint is Dckt #1, Nehlen's First Motion to Dismiss is Dckt #6, Plaintiffs' First Amended Complaint is Dckt #10, Nehlen's Second Motion to Dismiss is Dckt #11, the Court struck, *sua sponte*, Plaintiffs' First Amended Complaint on May 4, 2018, Plaintiffs refiled Plaintiffs' First Amended Complaint as Dckt #12, Nehlen's Third Motion to Dismiss is Dckt #13, the Court denied without prejudice Nehlen's Third Motion to Dismiss until a "meet and confer" would occur per Dckt #20, the meet and confer occurred between Nehlen's attorney and Plaintiffs' attorney on May 22, 2018, and now Nehlen is filing Nehlen's Fourth Motion to Dismiss.

3.   Assuming, *arguendo*, the Court enjoys personal jurisdiction over Nehlen, the case against Nehlen should still be dismissed in accordance with Fed. R. Civ. P. 12(b)(6) for the reasons set forth in the attached Brief.

WHEREFORE, Nehlen prays that this Honorable Court will dismiss the instant civil action against Nehlen with prejudice.

Respectfully submitted,

**BRISTOW LAW, PLLC**

/s/ Kyle J. Bristow
Kyle J. Bristow (P77200)
P.O. Box 381164
Clinton Twp., MI 48038
(T):  (248) 838-9934
(F):  (586) 408-6384
(E):  BristowLaw@gmail.com
*Attorney for Paul Nehlen*

Dated:  May 30, 2018

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **JOEL VANGHELUWE, ET AL.,** | Case No. 2:18-cv-10542-LJM-EAS |
| Plaintiffs, | Hon. Laurie J. Michelson |
| v. | Mag. Elizabeth A. Stafford |
| **GOTNEWS, LLC, ET AL.,** | |
| Defendants. | |

**DEFENDANT PAUL NEHLEN'S BRIEF IN SUPPORT OF HIS FOURTH MOTION
FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 12(B)(2) AND 12(B)(6)**

## TABLE OF CONTENTS

I. CONCISE STATEMENT OF ISSUES PRESENTED ............................................................. 1

II. CONTROLLING LEGAL AUTHORITIES ........................................................................ 2

III. INDEX OF AUTHORITIES ........................................................................................ 3

IV. STATEMENT OF RELEVANT FACTS ........................................................................ 6

V. LAW & ARGUMENT .................................................................................................. 8

    A. PLAINTIFFS' CLAIMS AGAINST NEHLEN MUST BE DISMISSED
        PURSUANT TO FED. R. CIV. P. 12(B)(2) ........................................................... 8

        1. STANDARD OF REVIEW ................................................................................ 8

        2. PRINCIPAL POINT OF ARGUMENT ............................................................ 9

        3. CONCLUSION ................................................................................................ 15

    B. PLAINTIFFS' CLAIMS AGAINST NEHLEN MUST BE DISMISSED
        PURSUANT TO FED. R. CIV. P. 12(B)(6) ........................................................ 15

        1. STANDARD OF REVIEW .............................................................................. 15

        2. PRINCIPAL POINT OF ARGUMENT .......................................................... 15

        3. CONCLUSION ................................................................................................ 22

VI. CONCLUSION ........................................................................................................... 23

## I.  CONCISE STATEMENT OF ISSUES PRESENTED

1. Whether the Court should dismiss the instant civil action against Defendant Paul Nehlen ("Nehlen") pursuant to Fed. R. Civ. P. 12(b)(2) on the basis that the Court lacks personal jurisdiction over him.

> Plaintiffs' Anticipated Response:  "No."

> Nehlen's Response:  "Yes."

2. Whether the Court should dismiss the instant civil action against Nehlen pursuant to Fed. R. Civ. P. 12(b)(6) on the basis that Plaintiffs Jerome Vangheluwe ("Jerome") and Joel Vangheluwe ("Joel") (Jerome and Joel collectively "Plaintiffs") have failed to state a claim against Nehlen upon which relief can be granted.

> Plaintiffs' Anticipated Response:  "No."

> Nehlen's Response:  "Yes."

1

## II.  CONTROLLING LEGAL AUTHORITIES

**CASE LAW**

*Binion v. O'Neal*, 95 F.Supp.3d 1055 (E.D. Mich. 2015).....................................7, 8, 9, 12

*Jones v. Dirty World Entertainment Recordings, LLC*, 775 F.3d 398 (6th Cir. 2014)........................................................................................................................18-21

*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016) ............................................4, 17

**STATUTORY LAW**

47 U.S.C. § 230 ...............................................................................................16-18, 20-21

**CONSTITUTIONAL LAW**

None

**COURT RULES**

Fed. R. Civ. P. 12(b)(2)   ........................................................................................8, 15, 24

Fed. R. Civ. P. 12(b)(6)........................................................................................8, 15, 22, 24

## III. INDEX OF AUTHORITIES

**CASE LAW**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................15

*Ayyadurai v. Floor64, Inc.*, 270 F.Supp.3d 343 (D.Mass. 2017) ................................20-21

*Bell A. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................15

*Binion v. O'Neal*, 95 F.Supp.3d 1055 (E.D. Mich. 2015) .................................... 7, 8, 9, 12

*Bridgeport Music, Inc. v. Still N the Water Pub.*, 327 F.3d 472 (6th Cir. 2003) ................9

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ...........................................................10

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996)..........................................10

*Dannis v. C&G Publ'g, Inc* 187 Mich.App. 691, 468 N.W.2d 331 (Mich. Ct. App. 1991) .........................................................................................................................22

*Dean v. Motel 6 Operating, L.P.*, 134 F.3d 1269 (6th Cir. 1998).......................................8

*Directory Assistants v. SuperMedia, LLC*, 884 F.Supp.2d 446 (E.D. Va. 2012) .............18

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)........................................................22

*Howe v. Detroit Free Press*, 219 Mich.App. 150, 555 N.W.2d 738 (1996), *aff'd*, 457    Mich.    871,    586    N.W.2d    85    (Mich.    Ct.    App. 1998) ......................................................................................................................22

*Hyperbaric Options, LLC v. Oxy-Health, LLC*, No. 12-12020, 2013 WL 5449959 (E.D. Mich. 2013) ..............................................................................................11

*Intera Corp. v. Henderson*, 428 F.3d 605 (6th Cir. 2005) ..................................................9

*Jeffrey v. Rapid American Corp.*, 448 Mich. 178, 529 N.W.2d 644 (Mich. 1996) ..........14

*J. McIntyre Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011).................10

*Jones v. Dirty World Entertainment Recordings, LLC*, 775 F.3d 398 (6th Cir. 2014).....................................................................................................................18-21

*Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008)..........................................................15

*Lifestyle Lift Holding Co. v. Prendiville*, 768 F.Supp.2d 929 (E.D. Mich. 2011)........10-11

*Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675 (6th Cir. 2012) .........................................8

*Nationwide Mut. Ins. Co. v. Tryg Int'l. Ins. Co.*, 91 F.3d 790 (6th Cir. 1996) ....................8

*Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883 (6th Cir. 2002)................8-10, 12

*Oberlies v. Searchmont Resort, Inc.*, 246 Mich.App. 424, 633 N.W.2d 408 (Mich. Ct. App. 2001)............................................................................................................14

*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016) ..................................................17

*Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) .................................................22

*Parisi v. Sinclair*, 774 F.Supp.2d 310 (D.D.C. 2011).........................................................20

*Roca Labs, Inc., v. Consumer Opinion Corp.*, 140 F.Supp.3d 1311 (M.D. Fla. 2015)..............................................................................................................17-18

*So. Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968) ....................10

*Theunissen v. Matthews*, 935 F.2d 1454 (6th Cir. 1991) .......................................................9

*Time, Inc., v. Pape*, 401 U.S. 279 (1971)..........................................................................22

*Thomas v. Barrett*, No. 1:12-CV-00074, 2012 WL 2952188 (W.D. Mich. 2012) ...........11

*Weather Underground, Inc. v. Navigation Catalyst Sys., Inc.*, 688 F.Supp.2d 693 (E.D. Mich. 2009) ......................................................................................................11

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D. Pa. 1997) ..............10-12

## STATUTORY LAW

M.C.L. § 600.705.......................................................................................................9, 13-14

M.C.L. § 600.711 ................................................................................................................9

47 U.S.C. § 230....................................................................................... 16-18, 20-21

47 U.S.C. § 230(c)(1) ...............................................................................................16-18

47 U.S.C. § 230(f)(2) ...................................................................................................16

47 U.S.C. § 230(f)(3) ...................................................................................................17

**CONSTITUTIONAL LAW**

None

**COURT RULES**

Fed. R. Civ. P. 12(b)(2)........................................................................................ 8, 15, 24

Fed. R. Civ. P. 12(b)(6).................................................................................. 8, 15, 22, 24

Fed. R. Civ. P. 12(g)(1)...............................................................................................8

## IV.  STATEMENT OF RELEVANT FACTS

Plaintiffs are a father and son who were accused of misconduct in an article that was originally written and published on the World Wide Web by Defendant GotNews, LLC ("GotNews").  (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 1, 6, 79-82).  Jerome previously legally owned the vehicle that was used to "murder" Heather Heyer during the "Unite the Right" rally which occurred in Charlottesville, Virginia, on August 12, 2017.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 3, 7, 77).  GotNews incorrectly alleged in the article at issue in the instant controversy that Jerome still owned the vehicle and that Joel was the perpetrator of the attack. (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 8, 107).

The article published by GotNews resulted in death threats being made against Plaintiffs by unknown third-parties.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 108).

Plaintiffs are citizens of the State of Michigan.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 11-12).  Nehlen is a citizen of the State of Wisconsin and is currently seeking office to be a congressman.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 34).

Plaintiffs sued Nehlen for a posting that Nehlen published on Nehlen's online Twitter profile on August 12, 2017, in which Nehlen provided readers a hyperlink to the GotNews article and stated, "BREAKING: #Charlottesville Car Terrorist Is Anti-Trump, Open Borders Druggie." (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 106).

Nehlen has no meaningful contacts—whether intentional or unintentional—with the State of Michigan that are contemporaneous with the purportedly tortious conduct alleged within Plaintiffs' Complaint; to wit:  Nehlen's congressional campaign has received some donations from Michigan residents, Nehlen served as the director and general manager of a corporation in Michigan from 2012 to 2013, Nehlen previously owned property in the State of Michigan, Nehlen

was registered to vote in Richland, Michigan, in 2012, and Nehlen attended one political event in

Mt. Pleasant, Michigan, in February of 2018.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶

41).

The United States District Court for the Eastern District of Michigan previously articulated

how Twitter works:

> Twitter is a social media website that allows users to post "Tweets," which are
> described as "an expression of a moment or idea.  It can contain text, photos, and
> videos.  Millions of Tweets are shared in real time, every day." (*The Story of a
> Tweet:  What Is a Tweet*, Twitter.com, https://about.twitter.com/what-is-
> twitter/story-of-a-tweet (last visited March 12, 2015)). * * * Twitter allows users
> to "share photos, in real time, with everyone or with the people [they] choose." (*So
> Much More than Words*, Twitter.com, https://about.twitter.com/products/photo-
> sharing (last visited March 12, 2015)).  Twitter users can also "follow" other users,
> so that others' Tweets will appear in the user's Twitter feed.  Finally, Twitter allows
> users to re-post or "Retweet" content from other users' Twitter feeds to be shared
> with their own followers.  (*The Story of a Tweet: What Is a Tweet*, Twitter.com,
> https://about.twitter.com/what-is-twitter/story-of-a-tweet (last visited March 12,
> 2015)).

*Binion v. O'Neal*, 95 F.Supp.3d 1055 (E.D. Mich. 2015).

Plaintiffs' Complaint is devoid of any averments of fact demonstrating that Nehlen

purposefully directed in a meaningful manner his purportedly conduct towards the State of

Michigan in relation to the misconduct at issue to such an extent that personal jurisdiction over

him is proper here or that Nehlen even published a statement[2] about Plaintiffs which is in and of

itself actionable.  (Plaintiffs' First Amended Complaint, Dckt #12).

---

[2] Plaintiffs allege that Nehlen "incorporated by reference" the statements made in the GotNews
article by merely providing people a hyperlink to the same.  (Plaintiffs' First Amended Complaint,
Dckt #12, ¶ 106).  4,500 people re-Tweeted (a/k/a re-published) Nehlen's Tweet, and if Plaintiffs'
theory that merely publishing a hyperlink to a third-party's website constitutes a statement of fact
in and of itself, then Plaintiffs could conceivably sue every single one of these 4,500 people who
did so.  (Plaintiffs' First Amended Complaint, Dckt #12, Ex T).  Plaintiffs' theory of liability being
imposed for what a third-party publishes that is suggested to be viewed by a purported tortfeasor
is inapposite to the Communications Decency Act.

Plaintiffs are suing Nehlen for common law defamation, common law intentional infliction of emotional distress, and common law invasion of privacy—false light. (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 111-140).

## V. LAW & ARGUMENT

A motion to dismiss per Fed. R. Civ. P. 12(b)(2) may be joined by a motion to dismiss per Fed. R. Civ. P. 12(b)(6). Fed. R. Civ. P. 12(g)(1).

### A. PLAINTIFFS' CLAIMS AGAINST NEHLEN MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(2)

#### 1. STANDARD OF REVIEW

As was succinctly articulated in *Binion* concerning the standard of review for a motion to dismiss made per Fed. R. Civ. P. 12(b)(2) in the context of Twitter disparagement:

> A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) tests the court's personal jurisdiction over the defendant. The plaintiff bears the burden of establishing that personal jurisdiction exists. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The Sixth Circuit has clearly outlined the procedure for determining personal jurisdiction in Fed.R.Civ.P. 12(b)(2) challenges. *Dean v. Motel 6 Operating, L.P.*, 134 F.3d 1269, 1271-72 (6th Cir. 1998). When considering a motion under Rule 12(b)(2), a court has three choices: (1) rule on the motion based on the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean*, 134 F.3d at 1272. When a court rules on a 12(b)(2) motion to dismiss without an evidentiary hearing, the complaint and affidavits are considered in a light most favorable to the plaintiff. *Id.*

*Binion*, 95 F.Supp.3d at 1058.

"In diversity cases, federal courts apply the law of the forum state to determine whether personal jurisdiction exists." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012) (quoting *Nationwide Mut. Ins. Co. v. Tryg Int'l. Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996)). "In response to a motion to dismiss, the plaintiff may not stand on his pleadings, but must show the

specific facts demonstrating that the court has jurisdiction." *Miller*, 694 F.3d at 678 (citing *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

## 2. PRINCIPAL POINT OF ARGUMENT

The Court does not enjoy personal jurisdiction over Nehlen, and if there is one legal authority the Court should review in relation to this argument it is *Binion v. O'Neal*, 95 F.Supp.3d 1055 (E.D. Mich. 2015), because it contains a virtually identical fact pattern as the case at bar.

In *Binion*, former basketball star Shaquille O'Neal ("O'Neal")—a resident of Florida and Massachusetts—was sued by the plaintiff—a resident of Michigan—for mocking the plaintiff's physical deformities on O'Neal's Twitter page. *Binion*, 95 F.Supp.3d at 1057-1058. O'Neal's Twitter profile had 8.46 million followers at the time of the Tweeting. *Id.* at 1058.

O'Neal moved for dismissal of the civil action on the basis that the court lacked personal jurisdiction over him, which was not surprisingly granted by the court. *Id.* at 1061.

The *Binion* court succinctly provided an overview of how personal jurisdiction works for Internet-related tort cases involving social media and Michigan's long-arm statute:

> "A federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen Corp.*, 282 F.3d at 888 (citation omitted). In this case, Plaintiff is not invoking general jurisdiction under Michigan's general jurisdiction statute, M.C.L. § 600.711, but limited jurisdiction under Michigan's "Long Arm" statute, M.C.L. § 600.705. Michigan's limited jurisdiction provisions permit the exercise of jurisdiction to the extent limited by due process requirements; thus, "[w]here the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still N the Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003).
>
> The court's jurisdiction comports with due process "when defendant has sufficient minimum contacts such that traditional notions of fair play and substantial justice are not offended." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). The Sixth Circuit uses a three-part test in determining whether, consistent with due process, a court may exercise limited personal jurisdiction: (1) the defendant must

purposefully avail himself of the privilege of acting in the forum state or causing a consequence to occur there; (2) the cause of action must arise from the defendant's activities in the forum state; and (3) the defendant's acts or the consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over him reasonable. *So. Machine Co. v. Mohasco Industries, Inc*., 401 F.2d 374, 381 (6th Cir. 1968). There is an inference that the exercise of jurisdiction is reasonable where the first two elements have been satisfied. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir. 1996).

To establish purposeful availment, the defendant must perform some act whereby the defendant purposefully avails himself of the privilege of doing business in the forum state. *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). There must be a substantial connection between the defendant's conduct and the state such that the defendant "should reasonably anticipate being hauled into court there." *Id*. at 474. As the Supreme Court recently stated, "[t]he principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 2783, 180 L.Ed.2d 765 (2011).

In a tort case related to defamatory content posted on an internet website, courts in the Sixth Circuit have used two different tests to determine if purposeful availment has been established. First, the "Zippo test" considers how interactive the website is with the people in the forum state. See *Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F.Supp. 1119, 1124 (W.D. Pa. 1997). Second, the "Calder test" considers whether the "effects" of the defendant's intentional tortious conduct, which the defendant could expect to be felt in the forum state, was sufficient for the forum's courts to exercise jurisdiction over him. *Lifestyle Lift Holding Co. v. Prendiville*, 768 F.Supp.2d 929, 937 (E.D. Mich. 2011).

A. The Zippo Test

Under the Zippo test, "[a] defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp*., 282 F.3d at 890.

On one end of the spectrum are situations where a defendant clearly does business over the internet (i.e., enters into contracts with residents of forum state that involve the knowing and repeated transmission of computer files over internet). Under these circumstances, jurisdiction is proper. At the other end of the spectrum are those situations where the defendant simply posted information on a web site that is accessible to users in the forum state. However, such passive web sites are not grounds for jurisdiction. In the middle are those web sites that permit a user to exchange information with the host computer. In these situations, a court must consider the level of interactivity and the commercial nature of the information

10

exchange.  *Hyperbaric Options, LLC v. Oxy-Health, LLC*, No. 12-12020, 2013 WL 5449959, at *5 (E.D. Mich. Sept. 30, 2013) (citing *Zippo*, 952 F.Supp. at 1124).

Courts in this Circuit have held that social media websites "do not lend themselves" to the Zippo test because the defendants do not own or operate the websites, but is merely a visitor or an account holder; in addition, the websites are generally not used primarily to conduct business. See, e.g., *Hyperbaric Options*, 2013 WL 5449959, at *6.  Other courts have applied the Zippo test to social media websites and held that personal jurisdiction is not established by merely posting content on websites such as Facebook: although "slightly more interactive" because of the ability to "like," share, or comment on postings, the site "lack[s] a commercial nature, and additional interactivity [is] absent."  *Thomas v. Barrett*, No. 1:12-CV-00074, 2012 WL 2952188, at *4 (W.D. Mich. July 19, 2012).

A similar result is necessary here.  Although highly offensive, O'Neal's posts on Instagram and Twitter were little more than the posting of information on social media websites, which became accessible to users in Michigan and elsewhere.  The websites are not owned or operated by O'Neal, were minimally interactive, and the postings were not intended to conduct business.

B. The Calder "Effects" Test

Under the Calder "effects" test, a plaintiff must establish "(1) the defendant intentionally committed a tortious action which was expressly aimed for dissemination in the forum state, and (2) the brunt of the effects of the actions are felt within the forum state."  *Hyperbaric Options*, 2013 WL 5449959, at *6 (citing Lifestyle Lift Holding Co., 768 F.Supp.2d at 937).  However, "injury to a forum resident is not enough, and the Calder test has not been read to authorize personal jurisdiction in a plaintiff's home forum in the absence of 'something more' to demonstrate that the defendant directed this activity toward the forum state."  (citing *Weather Underground, Inc. v. Navigation Catalyst Sys., Inc*., 688 F.Supp.2d 693, 700 (E.D. Mich. 2009)).

Here, Plaintiff cannot establish that O'Neal's posts were "expressly aimed for dissemination" in Michigan.  Nor is there any allegation that O'Neal took affirmative steps to direct the posts to a Michigan audience.  Instead, O'Neal's posts were meant for a national or even international audience.  Here, the only connection to Michigan is Plaintiff's injury.  This, without "something more" is insufficient to establish personal jurisdiction over O'Neal under the "effects" test.

*Id.* at 1059-1060.

Plaintiffs bear the burden of showing in Plaintiffs' Complaint or in exhibits attached to

Plaintiffs' forthcoming response to Nehlen's instant Motion that the Court enjoys personal

jurisdiction over him.  *Neogen Corp.*, 282 F.3d at 887.  When the Court analyzes the alleged facts of the instant case with the applicable law, it is clear that the Court lacks personal jurisdiction over Nehlen by both the *Zippo* test and the *Calder* test.

Like O'Neal's posts on Twitter, Nehlen's Tweet was—to borrow the language from *Binion*—"little more than the posting of information on social media websites, which became accessible to users in Michigan and elsewhere.  The websites are not owned or operated by [Nehlen], were minimally interactive, and the postings were not intended to conduct business." *Binion*, 95 F.Supp.3d at 1060.  Thus, the Court does not enjoy personal jurisdiction over Nehlen per the *Zippo* test.

Plaintiffs' Complaint alleges that the Court enjoys personal jurisdiction over Nehlen per the *Calder* test, but Plaintiffs' Complaint makes this allegation in a conclusory manner without any averments of fact in support thereof which links Nehlen's purported misconduct to the State of Michigan.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 35).

Like O'Neal's posts on Twitter, Nehlen's Tweet was not "'expressly aimed for dissemination' in Michigan."  *Id*.  Just like in *Binion*—again parroting the language of that court—, Plaintiffs' Complaint is devoid of any allegation that Nehlen, as a defendant, "took affirmative steps to direct the posts to a Michigan audience.  Instead, [Nehlen]'s posts were meant for a national or even international audience.  Here, the only connection to Michigan is [Plaintiffs'] injury.  This, without 'something more' is insufficient to establish personal jurisdiction over [Nehlen] under the 'effects' test."  *Id*.

Although Plaintiffs feelings were hurt in Michigan, Nehlen's right to due process and to not be haled into a court that lacks personal jurisdiction over him is the Court's paramount concern.

Plaintiffs allege that Michigan's long-arm statute—M.C.L. § 600.705—affords Plaintiff's limited personal jurisdiction over Nehlen, but this is misguided for the aforementioned reasons. (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 37).  Says M.C.L. § 600.705:

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative **arising out of an act which creates any of the following relationships**:
>
> > (1) The transaction of any business within the state.
> >
> > (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.
> >
> > (3) The ownership, use, or possession of real or tangible personal property situated within the state.
> >
> > (4) Contracting to insure a person, property, or risk located within this state at the time of contracting.
> >
> > (5) Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.
> >
> > (6) Acting as a director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state.
> >
> > (7) Maintaining a domicile in this state while subject to a marital or family relationship which is the basis of the claim for divorce, alimony, separate maintenance, property settlement, child support, or child custody.

(Emphasis added).

Nehlen's irrelevant, infrequent, largely unintentional, and *de minimis* contacts with the State of Michigan—i.e., serving as the director and general manager of a corporation in Michigan from 2012 to 2013 (half a decade before the Tweet!), previously owning property in Michigan, being registered to vote in Michigan in 2012 (half a decade before the Tweet!), and attending a conservative political function six (6) months after the Tweet at issue (Plaintiffs' First Amended

Complaint, Dckt #12, ¶ 41)—are not contemporaneous acts which create any of the relationships cited in M.C.L. § 600.705 that give rise to Plaintiffs' claims against Nehlen.

In *Jeffrey v. Rapid American Corp.*, 448 Mich. 178, 186, 529 N.W.2d 644 (Mich. 1996), the Michigan Supreme Court used a three-part test for determining whether minimum contacts exist for personal jurisdiction to exist under Michigan's long-arm statute:

1.  The defendant must purposefully avail himself of the privilege of acting in the forum state;

2.  **The cause of action must arise from the defendant's activities in the forum state**; and

3.  The defendant's acts must have a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable.

(Emphasis added.)  See also *Miller*, 694 F.3d at 680-681 (holding that dismissal for lack of personal jurisdiction was proper because the plaintiff's cause of action was not "related to" or "connected with" the defendant's contact with Michigan); *Oberlies v. Searchmont Resort, Inc.*, 246 Mich.App. 424, 437, 633 N.W.2d 408 (Mich. Ct. App. 2001) ("[I]n order for a foreign defendant to be compelled to defend a suit brought in Michigan where the defendant's contacts with Michigan are limited solely to advertising aimed at Michigan residents, the defendant's instate advertising activities must, in a natural and continuous sequence, have caused the alleged injuries forming the basis of the plaintiff's cause of action.").

It is readily apparent that Plaintiffs' causes of action against Nehlen are completely unrelated to the insignificant forms of contact Nehlen has had with Michigan, and thus, Plaintiffs' reliance on Michigan's long-arm statute is meritless.

### 3.  CONCLUSION

For the reasons set forth herein, the Court does not enjoy personal jurisdiction over Nehlen and Nehlen is entitled to the dismissal of the instant civil action as it relates to him pursuant to Fed. R. Civ. P. 12(b)(2).

### B.  PLAINTIFFS' CLAIMS AGAINST NEHLEN MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(6)

### 1.  STANDARD OF REVIEW

When deciding a motion to dismiss per Fed. R. Civ. P. 12(b)(6), a court must construe the plaintiff's complaint in the light most favorable to the plaintiff and must accept all the factual allegations contained in the complaint as true.  *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

In order to survive a motion to dismiss per Fed. R. Civ. P. 12(b)(6), the plaintiff's complaint need contain only "enough facts to state a claim for relief that is plausible on its face." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 557).  "Determining whether a complaint states a plausible claim for relief will * * * be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### 2.  PRINCIPAL POINT OF ARGUMENT

When the Court carefully scrutinizes Nehlen's Tweet and takes into consideration the nuances of how Twitter works and elementary rules concerning Internet-related tort law, it is clear that Nehlen did not do anything that is actionable.

Plaintiffs are suing Nehlen for defamation, intentional infliction of emotional distress, and invasion of privacy.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 111-140).  All Nehlen did, however, was provide a hyperlink to the GotNews article on Nehlen's Twitter page.  (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 106, Ex T).  Nehlen did not himself author anything original about Plaintiffs but instead simply directed people to consider what GotNews wrote about Plaintiffs.  There is no liability for doing this.

Imagine, for example, instead of the controversy playing out on the World Wide Web it occurred at a street corner with two actors:  the tortfeasor engaged in defamatory speech (i.e., GotNews) and a person who heard what the tortfeasor says (i.e., Nehlen) and who exclaims to third-parties walking by, "Holy cow!  Did you hear what that guy over there just said about his victim?  You should listen to him."  Common sense dictates that the individual who originally published the defamatory content is solely liable for the same and that third-parties are not liable simply for drawing the attention of others to it.  Nehlen did not himself publish anything actionable about Plaintiffs; rather, Nehlen simply directed third-parties to consider what was published by GotNews on its website about Plaintiffs.

In the context of Internet law and the instant controversy, the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"), absolutely shields Nehlen from liability for what was published by GotNews.  The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The term "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet[.]"  47 U.S.C. § 230(f)(2).  The term "information content provider"

is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

In the instant case, GotNews is clearly the "information content provider" which published the article at issue in the instant controversy. (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 6, Ex A). Nehlen's Twitter profile—@pnehlen—is "an interactive computer service" which merely encouraged third-parties to read the GotNews article when Nehlen Tweeted a hyperlink to the same. (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 34). Pursuant to 47 U.S.C. § 230(c)(1), Nehlen is not civilly liable for the content that was provided by GotNews. There is simply no such thing as "incorporating" a statement and becoming civilly liable for it due to the CDA, which is, in essence, the entirety of Plaintiffs' claims against Nehlen. (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 106).

In *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), the plaintiff sued Google, Inc., and a number of other entities for publishing hyperlinks to derogatory content that has been published on the World Wide Web by third-parties. The *O'Kroley* court held that the CDA afforded Google, Inc., immunity from state and federal tort law—despite publishing hyperlinks to derogatory content in its search engine results—because a separate "entity [was] responsible * * * for the [content's] creation." *O'Kroley*, 831 F.3d at 355 (citing 47 U.S.C. § 230(f)(3)).

In the instant case, Nehlen did nothing more than what Google, Inc., did in the O'*Kroley* case: both defendants published hyperlinks to content written by third-parties. The case against Google, Inc., was dismissed, and the case against Nehlen should be dismissed.

In *Roca Labs, Inc., v. Consumer Opinion Corp.*, 140 F.Supp.3d 1311 (M.D. Fla. 2015), the federal court ruled in pertinent part that publishing a hyperlink to a website on Twitter is privileged

by right pursuant to the CDA.  Said *Roca Labs*, "Distributing a link via Twitter is materially indistinguishable from forwarding a link via email in that both methods do not substantively alter the content of the posts.  Thus, as in [*Directory Assistants v. SuperMedia*, *LLC*, 884 F.Supp.2d 446 (E.D. Va. 2012)], Section 230 immunity applies."  *Roca Labs*, 140 F.Supp.3d at 1321.

The Court's attention is directed to Professor Daxton R. "Chip" Stewart's scholarly article about Twitter users arguably not being civilly liable for re-Tweeting what other people publish online.  (Exhibit A – Stewart, Daxton.  "When Retweets Attack: Are Twitter Users Liable for Republishing the Defamatory Tweets of Others?"  Journalism & Mass Communication Quarterly 90(2) 233-247 (2013)).

Although Nehlen offered *de minimis* commentary about the article in his Tweet—("BREAKING: #Charlottesville Car Terrorist Is Anti-Trump, Open Borders Druggie.") (Plaintiffs' First Amended Complaint, Dckt #12, ¶ 106, Ex T)—, this is not sufficient for Nehlen to be deemed a co-creator of the original derogatory content published by GotNews which has understandably plagued Plaintiffs.  As was noted by *Roca Labs*, the immunity applies if the source of the information is derived from a third-party, much less the statement at issue itself.  *Id.* at 1322 and 1323.  In this case, the source of Nehlen's opinion comes solely from the GotNews website.

In *Jones v. Dirty World Entertainment Recordings, LLC*, 775 F.3d 398 (6th Cir. 2014), the Sixth Circuit dealt with a case in which defamatory posts were published on a trash-gossip website accessible at www.TheDirty.com.  Said the *Jones* court of the fact pattern of that case:

> Jones was found to be the object of defamatory content published on a user-generated, online tabloid; however, the judgment in her favor cannot stand. Under the CDA, Richie and Dirty World were neither the creators nor the developers of the challenged defamatory content that was published on the website. Jones's tort claims are grounded on the statements of another content provider yet seek to impose liability on Dirty World and Richie as if they were the publishers or speakers of those statements. Section 230(c)(1) therefore bars Jones's claims. Accordingly, we vacate the judgment in favor of Jones and reverse the district

court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

*Jones*, 775 F.3d at 402.

In *Jones*, a third-party information content provider wrote the derogatory material and the defendant—the user of a website service provider—thereafter offered commentary about the same:

> First, on October 27, 2009, a visitor to www.TheDirty.com submitted two photographs of Jones and a male companion and the following post:

> > THE DIRTY ARMY:  Nik, this is Sara J, Cincinnati Bengal Cheerleader. She's been spotted around town lately with the infamous Shayne Graham. She has also slept with every other Bengal Football player. This girl is a teacher too!! You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

> Appearing directly beneath this post, Richie added:

> > Everyone in Cincinnati knows this kicker is a Sex Addict. It is no secret... he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly. – nik

*Id.* at 403.

Following the publishing of the above-mentioned derogatory content by a third-party user and the commentary by www.TheDirty.com website proprietor Hooman Karamian (a/k/a Nik Richie) ("Karamian"), a different third-party information content provider published additional derogatory content to which Karamian published additional derogatory commentary.  *Id.* at 404. The Sixth Circuit deemed this derogatory editorializing by Karamian as being privileged by right per the CDA since the source of the originally actionable information came from someone other than Karamian:

> The district court also suggested that when an interactive computer service provider adds commentary to third-party content that "ratifies or adopts" that content, then the provider becomes a "creator" or "developer" of that content and is not entitled to the CDA's protection. *Jones IV*, 965 F.Supp.3d at 821, *see also id.* at 823 ("Thus, Richie's conduct cannot be said to have been 'neutral with respect to the offensiveness of the content,' such that he is not 'responsible' for it within the

19

meaning of 47 U.S.C. § 250(f)(3).").  An adoption or ratification theory, however, is not only inconsistent with the material contribution standard of "development" but also abuses the concept of responsibility.  A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc*.  To be sure, a website operator's previous comments on prior postings could encourage subsequent invidious postings, but that loose understanding of responsibility collapses into the encouragement measure of "development," which we reject.  *See, e.g., Roommates*, 521 F.3d at 1174; *Batzel*, 333 F.3d at 1031.  As other courts have recognized, the adoption theory of "development" would undermine the CDA for the same reasons as an encouragement theory.  *See Parisi v. Sinclair*, 774 F.Supp.2d 310, 316 (D.D.C. 2011) (dismissing plaintiffs' claims as barred by the CDA despite their argument that defendant "adopted" the statements at issue as its own and finding that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet, by establishing immunity for internet publication of third-party content to require a fact-based analysis of it and when a defendant adopted particular statements and revoke immunity on that basis" (internal citations and quotation marks omitted)).

We now apply the material contribution measure of "development" to the facts of this case.  Jones's defamation claims target the statements that were posted by a third party on October 27 and December 7, 2009.  Because Dirty World and Richie did not materially contribute to the illegality of those statements, the CDA bars Jone's claims.  *See Nemet*, 591 F.3d at 260 (affirming dismissal where plaintiff failed to show defendant "was responsible for the creation of the allegedly defamatory content *at issue*" (emphasis added).

*Id*. at 415.

Just as Karamian was shielded from liability via the CDA because he did not materially contribute to the original derogatory article for which he opined about thereafter, Nehlen is, likewise, shielded from liability by the CDA because he did not materially contribute to the original article published by GotNews for which Nehlen thereafter opined.  See *Ayyadurai v. Floor64, Inc.*, 270 F.Supp.3d 343, 367 (D.Mass. 2017):

"Section 230 immunity should be broadly construed."  Universal Commc'n. Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007); accord Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016) ("There has been near-universal agreement that section 230 should not be construed grudgingly."). "Congress enacted [the CDA] partially in response to court cases that held internet publishers liable for defamatory statements posted by third parties on message boards maintained by the publishers." Jane Doe No. 1, 817 F.3d at 18. The statute was intended to prevent tort liability from "chilling" online speech[.]  *Lycos*, 478

F.3d at 418-19 (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)).

In *Ayyadurai*, the derogatory article at issue "includes hyperlinks to the original comments[.]" *Ayyadurai*, 270 F.Supp.3d at 367. Quoting the Sixth Circuit's *Jones* opinion, the *Ayyadurai* court noted that "'merely taking action that is necessary to the display of allegedly illegal content,' including republishing and commenting upon user generated content, does not constitute 'creation or development.'" *Id.* quoting *Jones*, 755 F.3d at 410. The CDA protects the republishing of content by third-parties who thereafter opine about it—which is exactly what Nehlen did in the instant case—:

> In *Jones*, for example, the Sixth Circuit held that a website manager who had selected defamatory comments from among thousands of user submissions and posted those comments to his website, adding his own commentary, was immune under § 230. *Id.* at 415-16. The court reasoned that simply selecting the comments for publication and adding commentary " did not materially contribute to the defamatory content of the statements." *Id.* at 416. Similarly, in *Batzel v. Smith,* 333 F.3d 1018 (9th Cir. 2003), the Ninth Circuit held that the operator of a listserv was immune under § 230 when he made minor edits to and published, both to the listserv and to his website, an e-mail that he had received from a third party. *Id.* at 1031.
>
> Applying those principles here, it is clear that Beadon was neither the " creator" nor "developer" of the statements at issue. Beadon simply selected a user-submitted comment and re-posted it, without modifying the content of the comment. Republishing an already-existing user-submitted comment, without altering the content of that comment, does not materially contribute to its allegedly defamatory nature. While Beadon arguably adopted or ratified the comments by selecting them for re-publication, " [a]n adoption or ratification theory ... is not only inconsistent with the material contribution standard of 'development' but also abuses the concept of responsibility. A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc"* *Jones*, 755 F.3d at 415. Accordingly, the defamation claim based on Beadon's article is barred by the CDA.

*Ayyadurai*, 270 F.Supp.3d at 368.

Furthermore, Nehlen has a right, as recognized by Michigan law as the "wire service defense," to offer inaccurate commentary about breaking news stories of public concern—even

21

when the underling news story constitutes fake news—, such as the one published by GotNews and thereafter written about by *Freedom Daily*, *The Gateway Pundit*, *Puppet String News*, *Studio News Network*, *Story.com*. (Plaintiffs' First Amended Complaint, Dckt #12, ¶¶ 44-45, 47, 49, 51). See *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) (holding that a federal court sitting in diversity jurisdiction must apply state substantive law to resolve claims arising under state law); *Howe v. Detroit Free Press*, 219 Mich.App. 150, 154, 555 N.W.2d 738 (1996), *aff'd*, 457 Mich. 871, 586 N.W.2d 85 (1998); *Dannis v. C&G Publ'g, Inc* 187 Mich.App. 691, 693, 468 N.W.2d 331 (Mich. Ct. App. 1991) (holding that a defendant who adopts a rational interpretation of publicly available information has a defense as a matter of law to a suit for defamation); see also *Time, Inc., v. Pape*, 401 U.S. 279 (1971); *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir. 1978). Notwithstanding the CDA providing Nehlen absolute immunity for re-Tweeting GotNews' article and briefly opining about the same, the aforementioned Michigan wire service defense also shields Nehlen from liability insofar as Nehlen adopted a rational interpretation of news published on GotNews's website and opined about it.

To muzzle people from talking about horrific tragedies—such as the Charlottesville fiasco—as they unfold and bits of information are reported by third-party news websites is offensive to the right of Americans to speak and think freely and to receive and transmit information.

### 3. CONCLUSION

For the reasons set forth herein, Plaintiffs have not alleged a claim against Nehlen for which relief can be granted, and thus Nehlen is entitled to dismissal of Plaintiffs' claims against him pursuant to Fed. R. Civ. P. 12(b)(6). Nehlen is simply not legally responsible for what GotNews published on its website about Plaintiffs even though Nehlen published a hyperlink to the same

and opined about it. The CDA is clear in that Nehlen is absolutely shielded for providing a hyperlink to GotNews' article about Plaintiffs and for Nehlen having offered commentary about content originally provided by GotNews. Furthermore, even if the elementary rules of the CDA—which Plaintiffs wantonly disregarded when they sued Nehlen—were not applicable, Nehlen still enjoys absolute immunity by way of Michigan's wire service defense insofar as Nehlen offered commentary about a publicly available news article.

## VI. CONCLUSION

For the reasons set forth herein, either the Court must dismiss the instant civil action against Nehlen—pursuant to Fed. R. Civ. P. 12(b)(2)—on the basis that it does not enjoy personal jurisdiction over him, or alternatively, the Court must dismiss the instant civil action against Nehlen—pursuant to Fed. R. Civ. P. 12(b)(6)—on the basis that Plaintiff's Complaint does not aver a cognizable claim against Nehlen with averments of fact in support thereof.

Respectfully submitted,

**BRISTOW LAW, PLLC**

/s/ Kyle J. Bristow
Kyle J. Bristow (P77200)
P.O. Box 381164
Clinton Twp., MI 48038
(T): (248) 838-9934
(F): (586) 408-6384
(E): BristowLaw@gmail.com
*Attorney for Paul Nehlen*

Dated: May 30, 2018

<u>**CERTIFICATE OF SERVICE**</u>

I, Kyle J. Bristow, affirm that I am an attorney of record for a party to the above-captioned civil action, and on May 30, 2018, I electronically filed this document upon the Clerk of the Court by using the Court's Electronic Filing System, which should send notification of said filing to all attorneys of record who are registered to receive such electronic service.

Furthermore, on May 30, 2018, I affirm that I placed true and accurate copies of this document in First Class, postage-prepaid, properly addressed, and sealed envelopes and in the United States Mail located in City of Mt. Clemens, Macomb County, State of Michigan, which were addressed to:  Lita Coulthard-Villanueva, 1543 Jeffries Ave., Anderson, CA 96007, and Kenneth Strawn, 23874 Cypress Ln., Mission Viejo, CA 92691.

/s/ Kyle J. Bristow
Kyle J. Bristow (P77200)
P.O. Box 381164
Clinton Twp., MI 48038
(T):  (248) 838-9934
(F):  (586) 408-6384
(E):  BristowLaw@gmail.com
*Attorney for Paul Nehlen*

Dated:  May 30, 2018