# EXHIBIT A
# STEWART, DAXTON.  "WHEN RETWEETS ATTACK: ARE TWITTER USERS LIABLE FOR REPUBLISHING THE DEFAMATORY TWEETS OF OTHERS?"  JOURNALISM & MASS COMMUNICATION QUARTERLY 90(2) 233-247 (2013)

# When Retweets Attack: Are Twitter Users Liable for Republishing the Defamatory Tweets of Others?

Journalism & Mass Communication Quarterly
90(2) 233–247
© 2013 AEJMC
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1077699013482913
jmcq.sagepub.com
**$SAGE**

Daxton R. "Chip" Stewart[1]

## Abstract

Under the republication doctrine, repeating false and defamatory statements has traditionally triggered liability for the repeater. However, some confusion has emerged regarding retweeting posts of others on Twitter, the popular microblog site. Does retweeting the defamatory statement of another open the retweeter to liability? This article examines exceptions to the republication doctrine, such as the single publication rule, the wire service defense, and the Communications Decency Act (CDA) to answer this question. A review of court opinions leads to the conclusion that Section 230 of the CDA provides a powerful shield for users of interactive computer services such as Twitter.

## Keywords

law and policy, Internet and technology, libel, Twitter

At the dawn of the twentieth century, noted Western sharpshooter and performer Annie Oakley brought more than fifty lawsuits over several years against newspapers in connection with a single Associated Press article accusing her of stealing a man's trousers in Chicago to help her buy cocaine.[1] She was wrongly identified; the actual defendant in the case was a Chicago woman and Oakley impersonator named Lillian

[1]Texas Christian University, Fort Worth, TX, USA

**Corresponding Author:**
Daxton R. "Chip" Stewart, Schieffer School of Journalism, Texas Christian University, TCU Box 298060, Fort Worth, TX 76129, USA.
Email: d.stewart@tcu.edu

Cody, who went by the stage name Any O'Klay. Oakley won all but two of the lawsuits, amassing tens of thousands of dollars in damage awards from the lawsuits.[2]

Oakley's successful string of lawsuits was made possible by the republication doctrine in libel law, which makes repeat publishers liable for the false and defamatory statements of others. But if Oakley's situation were to unfold today, things may turn out differently. The advent of social media tools, such as the social networking site Facebook and the microblog site Twitter, has transformed the way news and information spreads. Picture, if you will, the story first appearing on Twitter from the local @ChitownNews blog account as follows: "Annie Oakley charged with stealing man's trousers to buy cocaine. http://bit.ly/HUuHL5." The link is to a blog post about Oakley's alleged infamous actions. The @ChitownNews account only has about 100 followers, but this salacious tweet—that is, a 140-character posting on Twitter—could be expected to spread rapidly. Imagine that the *Chicago Tribune* retweets—that is, shares the original message by reposting to its followers—to nearly 80,000 people. Then, @BreakingNews retweets to its 3.8 million followers, adding a comment as follows: "The word from Chicago. RT @ChitownNews Annie Oakley charged with stealing man's trousers to buy cocaine. http://bit.ly/HUuHL5."

Under the classic republication doctrine, both of these retweets would trigger liability for defamation because the users repeated the original libel, likely causing Oakley additional harm by spreading the original defamatory tweet to substantially larger audiences. However, exceptions have developed in the past century to protect some republishers based on core First Amendment concerns, such as encouraging participation in the marketplace of ideas and avoiding the "chilling effect" that overburdensome libel damages may cause to freedom of speech and press.[3]

The purpose of this article is to examine libel liability for users of social media tools who share and forward potentially defamatory information. This study begins with a brief explanation of social media tools and the implications on libel law of the culture of sharing and informality they embrace. Next, the author uses legal research methodology to examine the republication doctrine, as well as modifications to it, including the wire service defense and the single publication rule, which have classically protected some secondary publishers but have struggled to fit challenges arising from online publication. This is followed by an examination of immunity for republication on interactive computer services provided by Section 230 of the Communications Decency Act of 1996, which has proven to be a strong shield for providers of online tools, but also includes a provision protecting users of such services that has rarely been applied by courts. Whether users are protected to the same extent as providers turns out to be the crucial question at the heart of this study. The article concludes with a discussion of the policy consequences of extending such immunity to social media users and the practical application of this analysis for Twitter.

## Social Media and Libel

Social networking sites have revolutionized modern human communication, enabling group formation and sharing on the web by allowing users to, as boyd and Ellison

outlined in 2007, "(1) construct a public or semi-public profile within a bounded system, (2) articulate a list of other users with whom they share a connection, and (3) view and transverse their list of connections and those made by others within the system."[4] These elements are at the core of social media tools, whether they are primarily used for social networking (such as Facebook and LinkedIn), for sharing videos and photos (YouTube, Flickr, Pinterest), or for sharing thoughts and ideas and other content through microblogs (Twitter, Tumblr).

When somebody shares an item on a social networking site such as Facebook, that item goes to a somewhat closed system of friends, visible only by those users the person chooses. However, when a person publishes on Twitter, he or she publishes to the entire world; unless the user has "protected" his or her tweets by making them readable only to accepted followers, anyone with access to the Internet can read the tweet when it is made.[5] Twitter activity includes about 340 million tweets per day, a "volume that makes it increasingly impractical for users to identify the most relevant pieces of information."[6] In the culture of Twitter, retweeting is a centrally important activity because it encourages Twitter users to communicate what they believe is important to their followers, to help them sort through the wave of tweets, and to judge the credibility of them. One study has found that Twitter users are "poor at determining whether a tweet was true or false, regardless of (their) experience with Twitter,"[7] suggesting that the credibility of a major news organization such as the *Chicago Tribune* greatly outweighs that of a less visible citizen or local blogger.

Twitter, founded in 2007 and amassing more than 140 million users worldwide five years later, embraces the social media culture of sharing, voluntariness, and seeming informality. One attorney has suggested that the culture of Twitter makes libel cases problematic because the "informal, loose, and haphazard" nature of tweets may shift the expectations of users so that the postings fall short of being statements of fact, as classic libel law requires.[8] However, there can be no question that social media postings such as tweets can be the subject of libel lawsuits. While no "Twibel" cases had reached a jury by late 2012, several have settled in advance. The first high-profile case in the United States involved musician and actress Courtney Love, who paid $430,000 in 2011 to settle a libel action by a designer she called a "nasty lying hosebag thief."[9]

Also in 2011, Associated Press sportswriter Jon Krawczynski tweeted from the sidelines of a basketball game between the Minnesota Timberwolves and the Houston Rockets, "Ref Bill Spooner told [Minnesota coach Kurt] Rambis he'd 'get it back' after a bad call. Then he made an even worse call on Rockets. That's NBA officiating folks."

The tweet immediately went out to the more than 2,000 followers of the @APKrawczynski account and was "retweeted" at least fourteen times.[10] The referee denied making the statement and filed suit, leading to the AP's paying $20,000 to settle the case and Krawczynski agreeing to delete the offending tweet from his account.[11]

Still, no court has ruled whether retweeters or other social media users who share potentially defamatory statements to their friends and followers count as "publishers" who could be held liable for repeating defamatory statements of others. The place to

begin this analysis is by examining the policy embedded in the classic republication doctrine and the classic exceptions to this doctrine that may extend to publication on social media.

## The Republication Doctrine

One of the elements a plaintiff is required to prove in a libel lawsuit is publication—that is, that the defamatory statement was communicated to a third person who was not the defamed.[12] British common law extended liability to those who repeated the libelous publications of others through the republication doctrine, which rests on the proposition that "any person who takes part in making the defamatory matter known to another may also be liable."[13] This rule became standard in American defamation law, as explained in a late-nineteenth-century treatise on libel by Newell, who noted that "Tale-bearers are as bad as tale-makers":

> A man cannot say there is a story in circulation that A. poisoned his wife or B. picked C.'s pocket in the omnibus, or that D. has committed adultery, and relate the story, and when called upon to answer, say: "There was such a story in circulation; I but repeated what I heard, and had no design to circulate it or confirm it"; and for two very plain reasons: (1) The repetition of the story must in the nature of things give it currency; and (2) the repetition without the expression of disbelief will confirm it. The danger—an obvious one—is that bad men may give currency to slanderous reports, and then find in that currency their own protection from the just consequences of a repetition.[14]

The policy underlying this approach is clear: repeating the defamatory statements of another should not shield the repeater from liability because of the potential for additional harm caused by the circulation of the statement, which may itself enhance the believability of the statement merely by being repeated enough times. As Prosser noted in his treatise on torts in 1941, "the courts have said many times that the last utterance may do no less harm than the first, and that the wrong of another cannot serve as an excuse to the defendant."[15]

However, this doctrine threatened to become a huge burden on the American publishing industry in the mid-twentieth century.[16] Under what was known as the "multiple publication rule," those who played a "secondary part in disseminating defamation" such as libraries, news vendors, booksellers, and other distributors, were able to claim immunity only when they could prove that they had no reason to believe the publications were libelous.[17]

One option to protect against defamation actions in multiple publications is the "wire service defense," which news publishers in some jurisdictions may claim to avoid liability for defamatory statements included in news stories they republish from a service such as the Associated Press. The defense protects republication by news publishers of stories from wire services from libel liability unless there are obvious inconsistencies in the story or if the news organization had reason to know the story was inaccurate.[18] The wire service defense was formally recognized in 1933, and today, about half of U.S. states recognize it in libel cases.[19] The defense was not

available to Oakley, who brought her lawsuits about three decades before, though at least one court sided with publishers against Oakley using similar reasoning, requiring wanton or reckless behavior by the republisher to trigger liability.[20] Nevertheless, the defense does not provide an absolute shield for republishers, nor would it neatly fit for Twitter users who repeat the tweets of other users, particularly those who are not publishing in a news capacity.

In response to the multiple publication rule and the limited scope of protection under the wire service defense, courts and legislatures in several states developed an exception that prevented the original publishers and distributors from facing an unending wave of litigation.[21] In 1952, the National Conference of Commissioners on Uniform State Laws followed these principles limiting distributor liability by drafting the Uniform Single Publication Act.[22] This model law largely mirrors the Second Restatement of Torts Section 577A, which provides "any one edition of a book or newspaper, or any one radio or television broadcast, exhibition or a motion picture or similar aggregate communication is a single publication," and thus can be the subject of just one lawsuit, with the statute of limitations on such actions beginning at the date of the original publication.[23] Most states have adopted this or a similar version of the "single publication rule," through either legislation or court ruling.[24] The U.S. Supreme Court has noted that the rule provides "a forum for efficiently litigating all issues and damage claims arising out of a libel in a unitary proceeding," while also protecting publishers "from harassment resulting from multiple suits."[25]

The single publication rule was being adapted by courts to the challenges of new publishing technologies before Congress enacted the Communications Decency Act of 1996, discussed below, that rendered many of the rulings about the single publication rule moot. However, because the Communications Decency Act may not resolve all matters regarding the retweet-as-republication dilemma, a brief discussion of the single publication rule in context of Internet publication is warranted.

In 1991, the federal court for the Southern District of New York ruled that CompuServe, an Internet database and library, was not responsible for defamatory statements made on the "Rumorville" forum by users of the service.[26] The court reasoned that CompuServe was "the functional equivalent of a traditional news vendor" that should be held to the same standard as a "public library, bookstore, or newsstand"; as a distributor that had no reason to know that the forum contained defamatory statements, CompuServe could not be liable for republishing defamatory statements.[27] Contrarily, a New York state court found that Prodigy, another interactive computer service, acted as a publisher rather than a distributor when it went beyond being a "passive conduit" for communication by making the "conscious choice" to engage in editorial control of content on its bulletin boards through software that screened the bulletin boards and board community leaders.[28] For defendants who fall outside of the immunity protection of the Communications Decency Act, acting as a distributor rather than as a publisher may provide a shield against libel actions, as a federal district court in California noted in 2002.[29] The distinction is, of course, the level of control—the passive conduit online is merely a distributor and not subject to liability as a republisher, while any exercise of editorial control would open up the host to liability.

The focus of the single publication rule is now mostly procedural, applying to statute-of-limitations issues arising for online publication. Courts have uniformly ruled against the proposition that online publication is continuous and indefinitely tolls the statute of limitations.[30] For example, the New York Supreme Court ruled in 2002 that the publication of a defamatory statement by the state on a website in 1996 was no longer actionable when the plaintiff filed suit in 1998, after the one-year statute of limitations had passed.[31] However, the court suggested that libel may still be actionable if there were "a separate aggregate publication from the original, on a different occasion," which is not merely delayed but instead "is intended to and actually reaches a new audience."[32]

In the Internet era, the coverage of the single publication rule clearly protects only original publishers and passive distributors, not those who make a conscious choice to spread potentially defamatory information. As such, when the libel of one publisher is republished—via retweet or otherwise shared—it is unlikely that the single publication rule would serve as a shield for the republisher. Twitter itself would certainly be treated as a distributor, rather than a publisher, because it does not exercise editorial control over its users; as Twitter notes in its Terms of Service, content is the responsibility of its creator, and Twitter "may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content."[33] But Twitter users who retweet the content of others are making a conscious choice to repeat this content, making them appear to be more classic republishers than distributors.

However, another level of immunity for Internet publishers and republishers is available, triggered in part by issues of distributor liability addressed in the aforementioned cases involving online providers such as CompuServe and Prodigy, which were growing concerned about their exposure to lawsuits.[34]

## The Communications Decency Act

The Communications Decency Act (CDA) was an effort by Congress to address confusion about the responsibility of computer services for defamatory, pornographic, and other potentially harmful postings by Internet users.[35] The CDA includes a safe harbor provision for Internet service providers and users, contained in one seemingly simple sentence in Section 230: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[36]

Ardia, in his comprehensive review of the history, intent, and subsequent application of Section 230, commented that this one sentence "upended a set of principles enshrined in common law doctrines that had developed over decades, if not centuries," in cases involving intermediaries such as publishers and distributors.[37] The CDA essentially removed the distinction between publishers and distributors, providing both safe harbor from defamation and other claims. As long as defendants qualify as a "user or provider" of an "interactive computer service,"[38] they are not responsible for hosting or republishing third-party content created by an "information content provider."[39]

The CDA was enacted in 1996, and Section 230 has proven to provide almost blanket immunity for Internet service providers, search engines, social networking sites, discussion forum hosts, and others that allow users to post content online. Courts have applied CDA immunity from liability for defamatory republication, for example, to the carousing blogger Tucker Max for negative reviews of a party thrown by a blueberry heir that were posted in the comments section of his blog;[40] to online service provider America Online for hosting a chat room that included comments suggesting that an attorney was homosexual;[41] to online dating site Matchmaker.com for hosting an actress's profile that included offensive, sexually explicit details posted by a harasser;[42] and to Craigslist, an online classified ad site, that hosted users' offers of homes for rent that violated Fair Housing Act antidiscrimination standards.[43] In each of these cases, the libel defendant was found to be a "provider" of an "interactive computer service" and thus was immune from liability for the acts of users.

The aforementioned cases all involve defendants that were websites or services acting as "providers" of interactive computer services. But Section 230 also extends immunity to "users" of such services that report content created by others. In almost all cases triggering a claim of immunity under Section 230 of the CDA, the defendant was found to be a "provider" of an interactive computer service, rather than a "user."[44] Social media tools such as Facebook and Twitter would be providers of interactive computer services and thus shielded from defamation lawsuits stemming from content posted by users on the service. But in the hypothetical situation involving Annie Oakley, how would Twitter users such as @ChicagoTribune (which retweeted the message) and @Breaking News (which quoted the tweet and added a comment) fare if they sought immunity under Section 230?

Such retweet liability depends on two issues: (1) whether courts would extend near blanket immunity for providers to users, and (2) the extent to which adding comments to the original tweet would make the user qualify as an "information content provider."

### Are Users the Same as Providers?

Congress left some room for interpretation by not explicitly defining "user" in Section 230. Furthermore, there are some policy reasons for treating them differently under the act, as the California Supreme Court explained in *Barrett v. Rosenthal*:

> [I]ndividuals do not face the massive volume of third party postings that providers encounter. Self-regulation is a far less challenging enterprise for them. Furthermore, service providers, no matter how active or passive a role they take in screening the content posted by users of their services, typically bear less responsibility for that content than do the users. Users are more likely than service providers to actively engage in malicious propagation of defamatory or other offensive material.[45]

However, courts have yet to treat "users" and "providers" of interactive computer services differently, and there is no guidance in the language of the law itself or its

legislative history that suggests that Congress intended Section 230 immunity to be stronger for providers than users.[46] Quite the contrary, users necessarily come under the definition of "interactive computer service," which requires "multiple users."[47] For example, the aforementioned case before the California Supreme Court involved a defendant who distributed defamatory email messages and Internet postings on an "Internet discussion group"; despite the language used to distinguish users from providers, the court found that the distributor was protected by Section 230, holding that "Congress employed the term 'user' to refer simply to anyone using an interactive computer service," regardless of how active the user's publishing acts are.[48] In another case out of California, *Batzel v. Smith*, when the operator of the Museum Security Network listserv republished parts of a message suggesting that a woman was a descendant of Heinrich Himmler and had paintings wrongfully seized by Nazis, the Ninth Circuit found that the operator was a "user" and thus immune from liability under Section 230; the court suggested that liability rested with the author of the email, not those who distributed it to a wider audience.[49]

As such, it could not be more clear that the "naked retweet"[50]—that is, pushing the "Retweet" button to circulate somebody else's tweet to one's own followers, as @ChicagoTribune did in the hypothetical situation in the introduction—would not trigger republisher liability for defamation. The decisions in *Batzel* and *Barrett* suggest that Section 230 of the CDA protects social media users when they share defamatory information with others.

## Does Adding or Altering Content Make One a Content Provider?

When content is added to the original tweet, as was done in the hypothetical by @BreakingNews, the application of Section 230 may be different. As mentioned in the context of multiple publication above, courts have typically distinguished between distributors and publishers by determining the amount of editorial control exercised. Distributors, as mere passive conduits, are exempt from liability, while those who took an active role are deemed to be publishers.

This policy is represented, to some extent, in the Ninth Circuit's holding in the *Roommate.com* case, in which an online housing website was found to be a content provider because its drop-down menus that included categories discriminating against possible renters in violation of the Fair Housing Act "materially contributed" to the content posted by people advertising homes for rent.[51] However, this reasoning has little support elsewhere. McBrearty said the "material contribution" standard established by the Ninth Circuit was a "startling about-face" from other courts' decisions and demonstrated a "flawed understanding" of Section 230 immunity.[52] Instead, McBrearty suggests that the "essential published content" standard previously established by the Ninth Circuit in the *Carafano v. Metrosplash.com* case is more appropriate.

In *Carafano*, the court said Section 230 protected Matchmaker.com in connection with defamatory sexual statements made about an actress posted by a user who was harassing her, reasoning that as long as the "essential published content" was made by third parties, the website was immune under Section 230.[53] Because Matchmaker.com provided only an online questionnaire and exercised no editorial control over the profiles, the "essential published content" was in the hand of users alone.

Again, the guidance in these cases regards providers, rather than users, of interactive computer services. But a similar policy has been echoed in cases involving users. In *Batzel v. Smith*, the defendant's circulation of defamatory emails was found to be immune under Section 230, even though the Ninth Circuit noted that the listserv operator "exercises some editorial discretion in choosing which of the e-mails he receives are included in the listserv mailing, omitting e-mails unrelated to stolen art and eliminating other material that he decides does not merit distribution to his subscribers."[54] In *Barrett*, similarly, the California Supreme Court found that when defendant Rosenthal posted an article written by a third party accusing two physicians of "stalking a Canadian radio producer," Rosenthal was a "user" shielded by Section 230 because the article was written by another person, the "content provider."[55] The court found that Congress intended there to be no distinction between "passive" and "active" users, treating both as distributors that are immune from defamation liability.[56] Because the "essential published content" was provided by a third party, Rosenthal was not liable for reposting on her web page, even if she had reason to believe that the statements were false and defamatory.[57]

Under the "essential published content" standard, retweets with added content would be protected as long as the republisher does not add new content that is independently defamatory. Under the reasoning in *Batzel* and *Barrett*, the "essential published content" in the introductory hypothetical situation would still be allegations of illegal activity by Annie Oakley published by @ChitownNews. When @BreakingNews retweets it, adding that it is "The word from Chicago," this seems to endorse the truth of the original tweet. However, endorsement of the "essential published content" is not enough to turn a user into a "content provider"; the defendants in *Batzel* and *Barrett* clearly endorsed the truth of the third-party messages they forwarded or circulated. By merely adding a comment, @BreakingNews likely would be able successfully to claim immunity from liability under Section 230.

The greatest challenge facing those who quote or otherwise modify tweets through editing to reduce their length is that courts will embrace the flawed logic of the Ninth Circuit in the *Roommate.com* case, which appears to contrast with its previous holdings favoring immunity for users republishing third-party content. In *Roommate.com*, the Ninth Circuit said its ruling in *Carafano* was "unduly broad," but held that, nevertheless, Matchmaker.com properly qualified for immunity because the libelous statements were "created and developed entirely by the malevolent user," while the website did "nothing to encourage the posting of defamatory content."[58] Similarly, the court said its ruling was consistent with *Batzel* because in that case, the defendant's "minor changes to the spelling, grammar and length of third-party content" did not cause him

Case 2:18-cv-10542-LJM-EAS   ECF No. 35-1   filed 05/30/18   PageID.763   Page 11 of 16

242                                    *Journalism & Mass Communication Quarterly 90(2)*

to lose his immunity under Section 230, but that further editorial conduct on the part of users—such as making a determination of whether to publish an item submitted by a "tipster" who did not believe it was being submitted for possible republication online—may remove such immunity.[59]

Applying this reasoning, Twitter users certainly would foresee the possibility that the tweets they post would be open to republication elsewhere on Twitter; unless the user chooses to "protect" his or her account through privacy settings,[60] the tweets can be viewed by anyone with a web connection and retweeted by anyone with a Twitter account.

## Conclusion

Barring a fundamental shift in the way courts apply Section 230 of the CDA, the only defendant the modern-day Annie Oakley could successfully sue in the string of Twitter libels would be local blogger @ChitownNews. Despite the republication and apparent endorsement of the defamatory tweet by members of the news media, including a major metropolitan newspaper and a national online news source with millions of followers, Section 230 makes it extremely difficult for Oakley to reach the deep pockets in this lawsuit.

This is, of course, fundamentally unfair to Oakley as a plaintiff. Her reputation has undoubtedly been harmed by the spread of false and defamatory information about her that began as a misinformed, scurrilous rumor at the local level before receiving widespread attention through the irresponsible behavior of republishers. This is exactly the rationale underlying the classic republication rule.

In the news context, some organizations give more weight to retweeting as a news activity. For example, the Associated Press, in its social media guidelines for employees, has suggested that a retweet can be construed as endorsement of the original material and thus should be handled cautiously, if not avoided altogether: "A retweet with no comment of your own can easily be seen as a sign of approval of what you're relaying. . . . These cautions apply even if you say on your Twitter profile that retweets do not constitute endorsements."[61] ESPN offers similar guidance in its social media policy, suggesting that on-air talent and reporters "think before you re-tweet" because "dissemination of others' tweets under your name represents an endorsement of that content."[62]

But the informal culture of Twitter makes defamation liability for retweets problematic. The Associated Press's policy has come under fire from several critics who saw it as overly restrictive and misunderstanding of what retweeting actually means.[63] Scholars examining Twitter use, similarly, have found users' motivations for retweeting to be complex; they may include amplifying tweets to a larger audience, acting as a curator for a specific audience, commenting on the tweets of others, publicly agreeing with another user, as an act of friendship or loyalty to the original tweeter, to gain followers or reciprocal retweets, and more.[64]

With this in mind, the immunity granted by Section 230 to Twitter users who retweet, and even comment on the retweets of others by embedding the original tweets

into their own posts, makes more sense. A retweet may be an endorsement, but it also may not, and the plain language of Section 230 reflects congressional intent that web users should not take on defamation liability for statements originating from third-party content creators. Similarly, a "modified tweet," designated by posting from one's own account, typing MT before the original tweeter's username, and editing the tweet that follows, is merely a "tweet that you had to truncate to save space" but that "retains the meaning of the original tweet in full, but the wording has changed."[65] As such, it falls within the basic editorial functions envisioned by the Ninth Circuit in the *Roommate.com* case—"minor changes to the spelling, grammar and length of third-party content"—that even this court in its attempt to limit Section 230 immunity found would not be subject to liability.[66]

On the other hand, a "hat tip," designated by HT followed by a username, gives credit for pointing you in the direction of something interesting, a "nod in acknowledgement that they provided you with the fodder (but not the content) for that tweet."[67] This use, which is preceded by the Twitter user's own thoughts, comments, or assertions, is less likely to be granted immunity under Section 230. If national sports broadcasting giant ESPN were to tweet, "Sharpshooter Oakley in drug trouble. HT @ChitownNews @BreakingNews," then ESPN would likely be deemed an information content provider. ESPN would be holding itself out as stating this information as fact, with no clear guidance as to the source of the information—users would have to click on the profiles and examine the tweets by @ChitownNews and @BreakingNews to see what had been said. In this situation, the "essential published content" would be "Sharpshooter Oakley in drug trouble," going beyond mere repeating to embracing the content, becoming more publisher than republisher, thus losing the shield of Section 230. Even if the ESPN hat-tip tweet were to include a hyperlink to the @ChitownNews blog, that would still likely trigger liability; the statement "Sharpshooter Oakley in drug trouble" is a restatement of what was to come in the link.[68]

If the only act that may render a repeater liable is a hat-tip tweet, tort recovery by Oakley of the damages she has suffered will be extremely difficult unless the local blogger is particularly well off. That said, as unfair as this may be to Oakley, it is not unusual in the grand history of libel law. As Prosser noted more than half a century ago,

> [T]here is a great deal of the law of defamation which makes no sense. It contains anomalies and absurdities for which no legal writer ever has had a kind word, and it is a curious compound of a strict liability imposed upon innocent defendants, as rigid and extreme as anything found in the law, with a blind and almost perverse refusal to compensate the plaintiff for a real and very serious harm.[69]

The "perverse refusal" to grant Oakley adequate recourse for harm to her reputation, however, comes with the benefits Congress likely intended when it provided immunity for online service providers and users. Internet users and technological innovators will not be discouraged from sharing information for fear of tort liability, removing any possible chilling effect for those who would distribute news or provide

forums to facilitate such distribution. The logic of extending the Section 230 shield to users of Twitter would extend to users of other social media tools that allow increased discourse of citizens by enabling a culture of informality and sharing that would very likely suffer if subjected to republication liability based on analog forms of communication. This does not come without risk to the reputation of some individuals. However, Annie Oakley's loss would be our gain.

### Declaration of Conflicting Interests

The author declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author received no financial support for the research, authorship, and/or publication of this article.

### Notes

1. *Butler v. News-Leader Co.*, 51 S.E. 213, 214 (Va. 1905).
2. Thomas R. Julin and D. Patricia Wallace, "Who's That Crack Shot Trouser Thief?," *Litigation* 28 (summer 2002): 1-7; Lionel Rothkrug, "Torts: Defamation: Uniform Single Publication Act: Civil Code Sections 3425.3, 3425.4," *California Law Review* 44 (March 1956): 146-52.
3. *New York Times Co. v. Sullivan*, 376 U.S. 254, 300 (1964).
4. danah m. boyd and Nicole B. Ellison, "Social Network Sites: Definition, History, and Scholarship," *Journal of Computer-Mediated Communication* 13 (October 2007): 210-30, 211.
5. Twitter, "About Public and Protected Tweets," Twitter.com, https://support.twitter.com/entries/14016 (accessed September 7, 2012).
6. Meredith Ringel Morris, Scott Counts, Asta Roseway, Aaron Hoff, and Julia Schwartz, "Tweeting Is Believing? Understanding Microblog Credibility Perceptions," in *Proceedings of the ACM 2012 Conference on Computer Supported Cooperative Work, Seattle, WA, February 11-15, 2012* (New York: Association for Computing Machinery, 2012): 441-50, http://research.microsoft.com/pubs/155374/tweet_credibility_cscw2012.pdf (accessed September 7, 2012).
7. Morris et al., "Tweeting Is Believing?," 448.
8. William Charron, "Twitter: A 'Caveat Emptor' Exception to Libel Law?," *Berkeley Journal of Entertainment and Sports Law* 1 (April 2012): 57-65, 64.
9. Anthony McCartney, "$430k Love Settlement Shows Tweets Can Be Costly," *Associated Press*, March 5, 2011.
10. Eric Freeman, "NBA ref sues AP writer over critical tweet," *Yahoo! Sports*, March 15, 2011, http://sports.yahoo.com/nba/blog/ball_dont_lie/post/NBA-ref-sues-AP-writer-over-critical-tweet?urn=nba-333790 (accessed September 7, 2012).
11. Lauren Dugan, "The AP Settles over NBA Twitter Lawsuit, Pays $20,000 Fine," *AllTwitter*, December 8, 2011, http://www.mediabistro.com/alltwitter/the-ap-settles-over-nba-twitter-lawsuit-pays-20000-fine_b16514#more-16514 (accessed September 7, 2012).
12. *American Jurisprudence 2d,* "Libel and Slander §220" (St. Paul, MN: West, 2012): 50; Peter F. Carter-Ruck, *Libel and Slander* (London: Archon Books, 1973), 76-77; William L. Prosser, *Handbook of the Law of Torts* (St. Paul, MN: West, 1941), 810-11.

13. Paul Mitchell, *The Making of the Modern Law of Defamation* (Portland, OR: Hart, 2005), 123.
14. Martin L. Newell, *The Law of Libel and Slander in Civil and Criminal Cases* (Chicago: Callaghan and Co., 1898), 350-51.
15. Prosser, *Handbook of the Law of Torts*, 813.
16. Sapna Kumar, "Comment: Website Libel and the Single Publication Rule," *University of Chicago Law Review* 70 (spring 2003): 639-62; Lori A. Wood, "Note: Cyber-Defamation and the Single Publication Rule," *Boston University Law Review* 81 (October 2001): 895-915.
17. Prosser, *Handbook of the Law of Torts*, 820.
18. Kyu Ho Youm, "The 'Wire Service' Libel Defense," *Journalism Quarterly* 70 (September 1993): 682-91.
19. Jennifer L. Del Medico, "Comment: Are Talebearers Really as Bad as Talemakers? Rethinking Republisher Liability in an Information Age," *Fordham Urban Law Journal* 31 (November 2004): 1409-42.
20. *Butler* at 215.
21. Joseph C. Knakal, "Problems under the Single Uniform Publication Act," *Washington and Lee Law Review* 15 (fall 1958): 321-26.
22. "Uniform Single Publication Act," *Uniform Laws Annotated* 9C (1952): 173.
23. *Restatement (2d) of Torts*, "Single and Multiple Publications" (Philadelphia: American Law Institute, 1977), 577A.
24. Kumar, "Comment: Website Libel," 642-43.
25. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984).
26. *Cubby v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991).
27. *Cubby* at 140-41.
28. *Stratton Oakmont v. Prodigy*, 23 Media L. Rep. 1794, at 11 (N.Y. Sup. Ct. Nassau, 1995).
29. Nevertheless, the district court held that the website, Matchmaker.com, acted as a publisher because it was more than a "passive conduit" by providing "tailored membership questionnaires" that prompted users to create potentially defamatory profiles. *Carafano v. Metrosplash.com*, 207 F. Supp. 2d 1055, 1073-1074 (C.D. Cal. 2002). This decision was affirmed on appeal, but the Ninth Circuit did not address this reasoning because it found that the Communications Decency Act disposed of the issue. *Carafano v. Metrosplash.com*, 330 F.3d 1119 (9th Cir. 2003), hereinafter *Carafano II*.
30. Wood, "Note: Cyber-Defamation."
31. *Firth v. New York*, 775 N.E.2d 463, 466 (N.Y. 2002).
32. *Firth* at 466.
33. Twitter, "Terms of Service," Twitter.com, para. 14, https://twitter.com/tos (September 7, 2012).
34. David Ardia, "Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity under Section 230 of the Communications Decency Act," *Loyola of Los Angeles Law Review* 403 (winter 2010): 373-506.
35. Communications Decency Act of 1996, 47 U.S.C. § 230(b)(2).
36. Communications Decency Act of 1996, 47 U.S.C. § 230(c)(1).
37. Ardia, "Free Speech Savior or Shield for Scoundrels," 411.
38. Defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).
39. Defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

40. *Dimeo v. Max*, 248 Fed. Appx. 280 (3rd Cir. 2007).
41. *Green v. America Online*, 318 F.3d 465 (3rd Cir. 2003).
42. *Carafano II* at 1119.
43. *Chicago Lawyers Committee for Civil Rights Under the Law v. Craigslist*, 519 F.3d 666 (7th Cir. 2008).
44. Ardia, "Free Speech Savior or Shield for Scoundrels," 448.
45. *Barrett v. Rosenthal*, 146 P.3d 510, 526 (Cal. 2006).
46. Ken S. Myers, "Wikimmunity: Fitting the Communications Decency Act to Wikipedia," *Harvard Journal of Law and Technology* 20 (fall 2006): 163-204.
47. Communications Decency Act of 1996, 47 U.S.C. § 230(f)(2).
48. *Barrett* at 515.
49. *Batzel v. Smith*, 333 F.3d 1018, 1030 (2003).
50. The Associated Press's standards editor used this phrase to describe tweets made without more detail or context. Caitlin Johnson, "The Naked Retweet Dilemma," *American Journalism Review*, December 6, 2011, http://ajr.org/Article.asp?id=5209 (accessed September 7, 2012).
51. *Fair Housing Council of San Fernando Valley v. Roommate.com*, 521 F.3d 1157, 1167-68 (9th Cir. 2007).
52. Brian J. McBrearty, "Case Note and Comment: Who's Responsible? Website Immunity under the Communications Decency Act and the Partial Creation or Development of Online Content," *Temple Law Review* 82 (fall 2009): 827-62.
53. *Carafano II* at 1124.
54. *Batzel* at 1021.
55. *Barrett* at 514.
56. *Barrett* at 527-28.
57. *Barrett* at 514.
58. *Fair Housing Council of San Fernando Valley* at 1171-72.
59. *Fair Housing Council of San Fernando Valley* at 1170-71.
60. Twitter, "Twitter Privacy Policy," Twitter.com, https://twitter.com/privacy (accessed September 7, 2012).
61. Associated Press, "Social Media Guidelines for AP Employees" (January 2012): 2-3, http://www.ap.org/Images/SocialMediaGuidelinesforAPEmployees-RevisedJanuary2012_tcm28-4699.pdf (accessed September 7, 2012).
62. ESPN, "Social Networking for Talent and Reporters" (August 2011): 1, http://frontrow.espn.go.com/wp-content/uploads/2011/08/social-networking-v2-2011.pdf (accessed September 7, 2012).
63. Johnson, "Naked Retweet Dilemma," 76.
64. danah boyd, Scott Golder, and Gilad Lotan, "Tweet Tweet Retweet: Conversational Aspects of Retweeting on Twitter," in *Proceedings of the 43rd Hawaii International Conference on Social Systems, Kauai, HI, January 5-8, 2010* (Los Alamitos, CA: Computer Society Press, 2011), 1-10, 8, http://csdl.computer.org/dl/proceedings/hicss/2010/3869/00/03-06-04.pdf (accessed September 7, 2012).
65. Lauren Dugan, "Advanced Twitter Terminology to Get You Tweeting Like a Pro," *AllTwitter*, June 29, 2011, para. 5, http://www.mediabistro.com/alltwitter/advanced-twitter-terminology-to-get-you-tweeting-like-a-pro_b10781 (accessed September 7, 2012).
66. *Fair Housing Council of San Fernando Valley* at 1170-71.
67. Dugan, "Advanced Twitter Terminology to Get You Tweeting Like a Pro," para. 7.

68. Hyperlinks are generally protected from defamation claims; as the Third Circuit held in a case involving hyperlinks in 2012, the traditional republication doctrine protects a "mere reference to an article, regardless how favorable it is *as long as it does not restate the defamatory material.*" *In re Philadelphia Newspapers, LLC*, 2012 U.S. App. LEXIS 15419, *33 (3rd Cir. 2012), emphasis added.
69. Prosser, *Handbook of the Law of Torts*, 777-78.

## Author Biography

**Daxton R. "Chip" Stewart**, Ph.D., LL.M., is an associate professor at TCU's Schieffer School of Journalism, where he teaches courses in media law and ethics. He is the editor of *Social Media and the Law: A Guidebook for Communication Students and Professionals* (Routledge, 2012).