UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL VANGHELUWE and
JEROME VANGHELUWE,

    Plaintiffs,

v.

GOT NEWS, LLC, *et al.*,

    Defendants.

Case No. 18-cv-10542
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

**OPINION AND ORDER GRANTING NEHLEN'S MOTION TO DISMISS [35], GRANTING WEIKART'S MOTION TO DISMISS [42], AND DENYING COULTHART-VILLANUEVA'S MOTION TO DISMISS [47]**

Doxing, short for "dropping documents," is the practice of disclosing a person's identifying information (e.g., their home address) on the Internet to retaliate against and harass the "outed" person. This opinion addresses an issue of first impression: when a defendant drops a plaintiff's documents on the Internet, does the defendant's doxing amount to constitutionally minimum contact with the state where the plaintiff resides? On the facts of this case, the Court finds that the defendant's disclosure of the plaintiff's home address on Twitter is the type of doxing that creates minimum contacts with the plaintiff's home state.

**I.**

**A.**

This case arises from a tragedy that occurred on the heels of the "Unite the Right" rally held in Charlottesville, Virginia.

On August 12, 2017, rallygoers arrived at Emancipation Park in Charlottesville, Virginia. Joe Heim, *Recounting a Day of Rage, Hate, Violence and Death*, Wash. Post, Aug. 14, 2017,

https://wapo.st/2CssdbW; *accord* Fox News, *Charlottesville White Nationalist Rally Blamed for 3 Deaths, Dozens of Injuries*, Fox News, Aug. 12, 2017, https://fxn.ws/2PDJ2pW. They "arrived in contingents, waving nationalist banners and chanting slogans. Many carried shields and clubs." Heim, *supra*. The rallygoers were met by counter-protesters: "Members of anti-fascist groups yelled at the rallygoers. Many of them also carried sticks and shields." *Id.* Shortly before 11:00 a.m., a fight broke out between the rallygoers and the counter-protesters. *Id.* Fortunately, law enforcement was able to subdue the violence without anyone suffering serious injuries. *Id.* In fact, the rallygoers headed toward downtown Charlottesville and the counter-protesters did not follow. *Id.* "[I]t felt like a major disaster had been averted." *Id.*

Tragically, that was not the case. Suddenly, a gray, 2010 Dodge Challenger plowed into a crowd of pedestrians. *See* Fox News, *supra*. "Heather Heyer, 32, of Charlottesville was killed, and 19 others were injured." Heim, *supra*. By the evening of the attack, James Alex Fields Jr. was identified as the driver of the Challenger.

But a few hours is a long time in today's world of online-only news organizations and social media. Shortly after the attack, users of a 4Chan.org forum (the "/pol/" or "Political Incorrect" forum, to be specific) searched vehicle records for the Dodge Challenger. 4Chan users found public records indicating that the car was, at one point, owned by Plaintiff Jerome Vangheluwe. (ECF No. 50, PageID.936.) A reporter for Defendant GotNews, LLC somehow obtained the information from the 4Chan.org board. (ECF No. 50, PageID.937.) And with the name Jerome Vangheluwe in hand, the GotNews reporter located the social media pages of Jerome's then 20-year-old son, Plaintiff Joel Vangheluwe. (*Id.*)

Based on the information gathered (or, from the Vangheluwes' perspective, lack of information gathered), GotNews identified Joel Vangheluwe as the person who had just killed one and injured 19 in Charlottesville. The article started this way:



3

(ECF No. 91, PageID.1323; *accord* ECF No. 12, PageID.468.)

Several other online news entities also identified Joel as the Charlottesville driver.

But it was not just online news outlets that implicated the Vangheluwes. People took to Facebook and Twitter. For instance, Lori Twohy posted the following on her Facebook page:

> Copy / paste only.
>
> This is the car that ran over our comrades.
> Killed 3. 11 v seriously injured.
>
> This vehicle is registered / owned by :
> Jerome Vangheluwe
>
> 2010 Dodge Challenger
> Vin # : 2b3cj4dv8ah111921
>
> Second photo is of laptop screen so I can see info in unaltered or false
>
> It's time to ACTUALLY strike back, comrades.

(ECF No. 1, PageID.107.) The redacted portion contained Jerome's home address. A number of people posted something very similar: Jerome's name, followed by his home address, followed by the year and make of the vehicle, and then the VIN. (*See e.g.*, ECF No. 1, PageID.105.)

As for the three defendants who have filed motions challenging jurisdiction, each tweeted about Jerome, Joel, or the GotNews article. Defendant Lita Coulthart-Villanueva tweeted the following (with the address information redacted by the Court): "Killer confirmed. Jerome Vangheluwe[,] [XXXX] Rd, [XXXX] TWP MI 480[XX,] 2010 Dodge Challenger VIN # :. . ." (ECF No. 12, PageID.537; *see also* R. 19, PageID.1386.) Defendant Richard Weikart tweeted: "Joel Vangheluwe from Romeo, Michigan Car OHIO LICENSE PLATE # GVF 1111 2010 GRAY DODGE CHALLENGER #Charlottesville was the attacker . . ." (ECF No. 12, PageID.557.) And

4

Defendant Paul Nehlen tweeted a link to the GotNews article. The tweet included the title of the article, "BREAKING: #Charlottesville Car Terrorist Is Anti-Trump, Open Borders Druggie." (ECF No. 12, PageID.559.)[1]

## B.

While James Alex Fields Jr. was actually driving the Dodge Challenger that Jerome had sold years earlier, the Vangheluwe family was busy hosting a wedding for a family member at their home in Michigan. (ECF No. 12, PageID.416.) "During that wedding the Vangheluwes' social media, emails, and text messages became overwhelmed with messages and posts." (*Id.*) According to Joel and Jerome, "the Vangheluwes began receiving countless anonymous threats." (ECF No. 12, PageID.457.) In fact, they say, "Michigan State police were notified and the family was warned to leave their home." (*Id.*) "Clients of Jerome Vangheluwe's business also became fearful after the online threats." (*Id.*)

To recover for the harm from the misidentification, Jerome and Joel filed this lawsuit against two news entities and twenty individuals. The Vangheluwes believe that the defendants "targeted [them] as political pawns in a 'doxing' campaign, shifting the blame from alt-right extremists to an innocent 20-year-old boy who never owned or drove the car in question." (ECF No. 12, PageID.416.) Plaintiffs have asserted three state-law tort claims against each defendant: defamation, intentional infliction of emotional distress, and false light. (ECF No. 12, PageID.458–461.)

---

[1] The Vangheluwes and Nehlen, via reply and proposed sur-reply, dispute whether Nehlen manually typed the article's title or whether the title was auto-generated by Twitter once Nehlen tweeted the link to the article. For purposes of this opinion it makes no difference; so the Court will grant the Vangheluwes' motion to file a sur-reply. (ECF No. 53.)

## C.

This opinion addresses four pending motions. Nehlen (a Wisconsin citizen), Weikart (Indiana), and Coulhart-Villanueva (California) each claim that this Court lacks personal jurisdiction and cannot require him or her to defend the Vangheluwes' claims in Michigan; each thus seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF Nos. 35, 42, 47.) And, as (foot)noted, the Vangheluwes' seek leave to file a sur-reply to Nehlen's motion. (ECF No. 53.)

## II.

### A.

The Vangheluwes have the burden of showing that Nehlen, Weikart, and Coulhart-Villanueva can be called to answer in Michigan. But when, as here, there has been no jurisdictional discovery and no evidentiary hearing, the Vangheluwes' burden is "relatively slight": they need only make a "*prima facie* showing that jurisdiction exists." *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (internal quotation marks omitted). Moreover, the pleadings and affidavits must be viewed in the light most favorable to Joel and Jerome. *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991). Further, to the extent that Nehlen's, Weikart's, or Coulhart-Villanueva's factual assertions controvert those in the Vangheluwes' pleadings and affidavits, the Court accepts Joel and Jerome's account over theirs. *See id.*

The Vangheluwes' seek to carry their burden by relying on the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984). There, the National Enquirer published an article stating that Shirley Jones (the *Partridge Family* matriarch) was an alcoholic. *Id.* at 788. Jones sued the National Enquirer, the author of the article, and the editor of the article (Calder) in California. *Id.* at 784. The two individual defendants, who worked for the National Enquirer in Florida, claimed that the

California court could not exercise personal jurisdiction over them. The Supreme Court disagreed. As the Vangheluwes' stress, the Court stated, "the brunt of the harm, in terms both of [Jones'] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 789.

But Jones' suit had additional ties to California. The Supreme Court noted that the author of the article made "phone calls to sources in California for the information contained in the article," the story "concerned" Jones' "California activities," and that the National Enquirer sold 600,000 copies a week in California (two times more than it sold in any other state). *Calder*, 465 U.S. at 785, 788. In other words, "California [wa]s the focal point both of the story and of the harm suffered." *Id.* at 789. Personal jurisdiction was thus "proper in California based on the 'effects' of [the defendants'] Florida conduct in California." *Id.* at 789.

Several Courts of Appeal have applied *Calder* to claims of defamation via the Internet.

*Cadle Co. v. Schlichtmann*, 123 F. App'x 675 (6th Cir. 2005), is one such case. There, Jan Schlichtmann had created the website "truthaboutcadle.com," which aimed to tell the truth about Cadle's debt-collection practices. *Id.* at 676. Cadle thought the website defamatory and sued in its backyard—Ohio. *See id.* The problem for Cadle was that Schlichtmann's website discussed "Cadle's activities in Massachusetts." *Id.* at 679. The truthaboutcadle.com website neither concerned Cadle's Ohio activities nor targeted an Ohio audience. *Id.* So even if Schlichtmann had defamed an Ohio-based company, that alone did not justify haling Schlichtmann into Ohio. *Id.*

*Clemens v. McNamee*, 615 F.3d 374 (5th Cir. 2010), is a lot like *Cadle*. There, Brian McNamee told SI.com (Sports Illustrated's website) that he had injected (seven-time Cy Young winner) Roger Clemens with steroids. *Id.* at 377. Clemens sued for defamation in Texas. *Id.* But SI.com had reported that McNamee had injected Clemens in Toronto and New York—not Texas.

7

*Id.* at 377, 380. In other words, McNamee's statements "did not concern activity in Texas." *Id.* at 380. "[N]or were [McNamee's statements] made in Texas." *Id.* Nor were they "directed to Texas residents any more than residents of any state." *Id.* Thus, Clemens could not sue McNamee in Texas. *See id.*

*Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011), lines up with *Cadle*, too. There, Al Biddinger posted an email about Greg Shrader to an internet forum. *Id.* at 1238. In Shrader's view, the email was defamatory and so he sued Biddinger (and others) in Oklahoma. *Id.* at 1237. The problem for Shrader was that the internet forum had "no particular tie to Oklahoma" and the email discussed Shrader's books and courses that were "sold worldwide through the internet." *Id.* at 1245. In other words, Shrader could not show that the defamatory posting was "directed specifically at a forum state audience or otherwise ma[d]e the forum state the focal point of the message." *Id.* at 1244.

One more Court of Appeals' decision—largely consistent with the above—presents the other side of the coin. In *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), John Tamburo operated a dog-breeding software company in Illinois. *Id.* at 697. Certain defendants posted on their websites that Tamburo had stolen their data about dog breeding to use in his software. *Id.* at 697. The Seventh Circuit found that Tamburo could sue the defendants for defamation in Illinois: "In some of [the defendant's] messages, readers were encouraged to boycott Tamburo's products; in others, Tamburo's Illinois address was supplied and readers were urged to contact and harass him." *Id.* at 706. In other words, there was more than just injury in the forum state; the defendants had "specifically directed" tortious conduct at the forum. *Id.* at 706.

Thus, the foregoing cases appear to establish this rule: merely posting a defamatory statement about the plaintiff online is not enough to hale the poster into the state where the plaintiff

8

resides; instead, the poster's conduct must have involved the plaintiff's state in some additional way. *See Air Prod. & Controls, Inc.*, 503 F.3d at 552 ("The Sixth Circuit, as well as other circuits, have narrowed the application of the *Calder* 'effects test,' such that the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."). For instance, the internet posting might be of more interest to people in the plaintiff's state than nationally. Or, as another example, the post might be of no special interest to those in the plaintiff's state but the poster makes special effort to publicize the post there.

Although this rule is derived from opinions issued before *Walden v. Fiore*, 571 U.S. 277 (2014), the rule is entirely consistent with *Walden*'s interpretation of *Calder*. According to *Walden*, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. And addressing *Calder* specifically, the Supreme Court noted that the National Enquirer had "a California circulation of roughly 600,000," that "[the] defendants relied on phone calls to 'California sources' for the information in their article," and that the defendants "wrote the story about the plaintiff's activities in California." *Walden*, 571 U.S. at 287. True, the injury was to Jones' reputation "in the estimation of the California public" and so the "tort actually occurred *in* California." *Id.* at 288. But it was the defendants' tortious conduct in the forum—"combined with the various facts that gave the article a California focus"—that permitted the court in California to exercise personal jurisdiction. *See id.* So pre- or post-*Walden*, there must be "something more" than just mere injury to the plaintiff in the forum.

The Vangheluwes think the law is otherwise—that it suffices to hale a defendant into the forum state if the defendant targeted a plaintiff who the defendant knew was a resident of the forum state. (*See* ECF No. 54, PageID.1100 (citing *Leibman v. Prupes*, No. 2:14-CV-09003-CAS, 2015

9

WL 898454 (C.D. Cal. Mar. 2, 2015)).) But most of the cases that the Vangheluwes cite, including *Liebman*, are from the Ninth Circuit and pre-*Walden*. (*See* ECF No. 54, PageID.1100–1101.) And the Ninth Circuit revised its rule post-*Walden*: "In *Walden*, the Supreme Court rejected our conclusion that the defendants' knowledge of the plaintiffs' strong forum connections, plus the foreseeable harm the plaintiffs suffered in the forum, comprised sufficient minimum contacts." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069–70 (9th Cir. 2017) (internal quotation marks and alterations omitted). True, one of the Vangheluwes cases is from within the Sixth Circuit: *Alahverdian v. Nemelka*, No. 3:15-CV-060, 2015 WL 5004886 (S.D. Ohio Aug. 24, 2015). But that case makes no mention of *Cadle* (or any of the other cases addressing defamation via the internet discussed above). And *Alahverdian* is distinguishable; there, at least some emails were sent "into the forum," 2015 WL 5004886 at *7; here, there were posts on Twitter.

So the question is this: Did Nehlen, Weikart, or Coulhart-Villanueva involve Michigan in some way other than tweeting allegedly defamatory remarks about someone residing in Michigan?

**B.**

As to Coulhart-Villanueva, the answer is "yes."

To understand why, it is helpful to know a bit about "doxing." In the Vangheluwes' view, Defendants "created and participated in a doxing campaign." (ECF No. 12, PageID.423.) "[D]oxing" (sometimes spelled "doxxing") is short for "dropping documents." *See* Mat Honan, Wired, *What is Doxing?*, https://www.wired.com/2014/03/doxing/ (Mar. 6, 2014). The practice involves "using the Internet to source out and collect someone's personal and private information and then publicly releasing that information online." Beth Brindle, *HowStuffWorks: What is Doxxing?*, https://bit.ly/2RAb86E (last visited Jan. 19, 2019). The "goal of doxxing is typically retribution, harassment or humiliation." *Id.* Indeed, Jerome and Joel allege, "Defendants created

10

and participated in a doxing campaign specifically targeted at Michigan citizens, with a call to action in Michigan with the goal of inciting violence against and endangering them in Michigan." (ECF No. 12, PageID.423–424.)

With that background, Coulhart-Villanueva's tweet takes on different meaning. Here, again, is the key portion of her tweet:

> Lita Villa-coult @clitav · 8/12/17
> Killer confirmed.
> Jerome Vangheluwe
> [redacted]
> 2010 Dodge Challenger
> Vin # :...

(ECF No. 1, PageID.99; *see also* R. 91, PageID.1386.) The redacted portion is a home address (street number, street, city, state, and zip code). Unlike Nehlen and Weikart (discussed below), Coulhart-Villanueva did more than assert or imply that Jerome or Joel was the Charlottesville driver. She did not even stop at "Killer confirmed. Jerome Vangheluwe from Romeo, Michigan." Instead, Coulhart-Villanueva took the further step of including the exact location of the Vangheluwes' house in Michigan. (ECF No. 12, PageID.437.) So it is reasonable to infer that Coulhart-Villanueva was doxing.

And two more facts help strengthen that inference. First, there is evidence of an effort to "drop the Vangheluwes' docs." At one point someone posted the following on Facebook:

> Can everybody stop circulating the dox on Jerome Vangheluwe now? You idiots have the wrong guy....

(ECF No. 91, PageID.1393; *accord* ECF No. 12, PageID.551)

11

Further strengthening the inference that Coulhart-Villanueva's tweet was doxing is that the formatting of her tweet matches the formatting of tweets that are more obviously doxing. For instance, Defendant Lori Twohy posted the following on her Facebook page:

> Copy / paste only.
>
> This is the car that ran over our comrades.
> Killed 3. 11 v seriously injured.
>
> This vehicle is registered / owned by :
> Jerome Vangheluwe
> ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
> ▇▇▇▇▇▇▇▇▇▇▇▇
>
> 2010 Dodge Challenger
> Vin # : 2b3cj4dv8ah111921
>
> Second photo is of laptop screen so I can see info in unaltered or false
>
> It's time to ACTUALLY strike back, comrades.

(ECF No. 1, PageID.107.) Twohy's post seems to be the definition of doxing. And the format of Coulhart-Villanueva's tweet—Jerome's name on one line, his address on the next two lines, then "2010 Dodge Challenger" on the fourth line, then the VIN on the last line—is similar. Thus, the format of Coulhart-Villanueva suggests that she copied and pasted from someone dropping docs. Indeed, Coulhart-Villanueva admits her tweet was a "copy/share" (although she cannot remember from whom or from where she copied). (ECF No. 47, PageID.868.)

To be clear, the Court does not hold that all doxing amounts to constitutionally minimum contacts with the forum state. After all, doxing might be accomplished by disclosing a person's *online* information (e.g., their Facebook username) in hopes that others will engage in some sort of cyberattack (e.g., plastering their Facebook wall with hateful comments). But that is not the situation here—Coulhart-Villanueva provided the Vangheluwes' physical, not virtual, address.

12

True, people from across the nation (indeed, world) could have used the physical address to say, send the Vangheluwes hate mail. But who could most readily visit Vangheluwes' residence? Michiganders. Consistent with that possibility, the Vangheluwes have alleged that "Michigan State police were notified [of threats] and the family was warned to leave their home" and that "[c]lients of Jerome Vangheluwe's business also became fearful after the online threats." (ECF No. 12, PageID.457.) In other words, it is plausible that Coulhart-Villanueva intended to pique Michiganders' interest with her tweet.

In her motion, Coulhart-Villanueva alleges facts that cut against a finding of minimum contacts with Michigan. She asserts, "[t]he post was intended as simple information, in that I believed it was announcing he had been caught and was already in custody and declaring the specifics of such!" (ECF No. 47, PageID.868.) She also points out that her tweet had no "Likes," was not re-tweeted, and had a total of four comments (two of which said that she had misidentified Jerome as the driver). (ECF No. 47, PageID.868.) Coulhart-Villanueva further informs the Court that she is not aware of any Twitter "followers" or "friends" in Michigan and that she has never visited Michigan or even knowingly communicated with anyone from Michigan. (ECF No. 47, PageID.869.) And she adds that she deleted the post within two hours of the original posting. (*Id.*)

Coulhart-Villanueva's allegations give the Court pause. Even granting that part of the reason for her tweet was to entice people in Michigan to take action against the Vangheluwes, if her tweet had a very small likelihood of reaching anyone in Michigan, that would seem to be a jurisdictionally relevant fact.

That said, at this pre-discovery stage of the litigation, the Vangheluwes' burden of establishing personal jurisdiction is "relatively slight." *Air Prod. & Controls*, 503 F.3d at 549. And Coulhart-Villanueva seems to admit that her tweet was publicly accessible. (ECF No. 47,

13

PageID.868 (providing that post was "shared to Twitter.com, a Publicly available Social Media Platform").) And while she deleted her tweet upon learning that she had misidentified Jerome as the Charlottesville driver, she also admits that was two hours later, Twitter archived the post, and that it remained discoverable if people knew how to search for it. (ECF No. 47, PageID.868–869.)

In sum, unlike Nehlen's and Wiekart's tweets, Coulhart-Villanueva's tweet is fairly characterized as doxing. And it is the type of doxing that involved providing a physical location—in Michigan. Thus, it is reasonable to infer that Coulhart-Villanueva's tweet was intended to cause some action in Michigan or catch the eye of those most able to make contact with the Vangheluwes, i.e., Michiganders. So Coulhart-Villanueva's tweet was contact with Michigan that satisfies the constitutional minimum. *Cf. Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010) ("In some of [the defendant's] messages, readers were encouraged to boycott Tamburo's products; in others, Tamburo's Illinois address was supplied and readers were urged to contact and harass him.").

The Court thus turns to the remaining two specific-jurisdiction inquiries. *See S. Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899, 903 (6th Cir. 2017) (setting out three-part test). The first asks whether the Vangheluwes' claims "arise from" Coulhart-Villanueva's contact with Michigan. *Id.* at 903. In the Sixth Circuit, this is a "proximate result" inquiry. *See Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 508 (6th Cir. 2014) ("[T]he Supreme Court has emphasized that only consequences that proximately result from a party's contacts with a forum state will give rise to jurisdiction."). While similar to tort's proximate-cause test, the personal jurisdiction variety is "somewhat looser." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 323 (3d Cir. 2007).

The Court finds that the Vangheluwes' three tort claims are the proximate result of Coulhart-Villanueva's attempt to call Michiganders to action. True, doxing is not necessarily

defamation. For instance, Jerome might have a viable defamation claim based on just the first two lines of Coulhart-Villanueva's tweet "Killer confirmed. Jerome Vangheluwe." And Coulhart-Villanueva could have doxed without making any defamatory statement—her same tweet without the "Killer confirmed" line. That said, for Coulhart-Villanueva to motivate readers of her tweet to take action against Jerome, it was important to identify Jerome as the Charlottesville driver. So the defamatory statement is the "proximate result" of Coulhart-Villanueva's doxing. Moreover, the Vangheluwes have a claim of intentional infliction of emotional distress and part of that claim is based on the alleged effects of Defendants' doxing. (*See* ECF No. 12, PageID.423–424.) And if Coulhart-Villanueva could be called to defend the IIED claim here, the Court could probably exercise pendent personal jurisdiction over the defamation and false-light claims against her. *See Knowledge Based Sols., Inc. v. Dijk*, No. 16-CV-13041, 2017 WL 3913129, at *9 (E.D. Mich. Sept. 7, 2017) (citing cases).

That leaves the last part of the specific-jurisdiction test: whether requiring Coulhart-Villanueva to defend in Michigan comports with "traditional conceptions of fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985). When, as here, the first two personal-jurisdiction criteria are satisfied, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Air Prod. & Controls*, 503 F.3d at 554 (providing that if the "first two criterion are met, an inference of reasonableness arises and only the unusual case will not meet this third criteria" (internal quotation marks omitted)). Coulhart-Villanueva has not.

It would be "fair play" and consistent with "substantial justice" to require Coulhart-Villanueva to defend this case in Michigan. The Court is empathetic to the hardship on Coulhart-Villanueva; she says she is "a severely Disabled Senior Citizen," that she is not "[p]hysically

15

[m]obile," and that her only income is social security. (ECF No. 47, PageID.870.) But other factors cut in favor of the Vangheluwes. Michigan does have an interest in seeing that its citizens are not defamed or the subject of a doxing campaign. And the Vangheluwes' have a considerable "interest in obtaining relief," an interest that would be burdened by having to pursue Coulhart-Villanueva in California. Moreover, the Court will minimize the hardship on Coulhart-Villanueva by, among other things, requiring the Vangheluwes to take her deposition near her home in California. On balance, the Court is not convinced that this is the "unusual" case where the first two parts of the specific-jurisdiction test are met but exercising personal jurisdiction violates constitutional due process. *See Air Prod. & Controls*, 503 F.3d at 554.

In sum, the Court believes it can, consistent with the Due Process Clause, require Coulhart-Villanueva to defend the Vangheluwes' claims in Michigan.

## C.

The personal-jurisdiction analysis as to Nehlen is different. Here, again, is what Nehlen tweeted:



So Nehlen either merely linked to the GotNews article or, at most, manually included the article's title with a link to the article (and the update to the article). True, the GotNews article did inform readers that the Dodge Challenger "was registered to a Jerome Vangheluwe of Michigan," that Joel had gone to high school in Romeo, Michigan, and that, at one point, Joel had aspired to go to Michigan State University. (ECF No. 1, PageID.30.) But that is not fairly deemed doxing as it did not provide Jerome's or Joel's current whereabouts with any specificity. And the majority of the GotNews article was dedicated to alleging that Joel used drugs, favored open borders, and was "anti" Trump. These allegations were not about Michigan in particular but about Joel in particular—wherever he might have been living. Moreover, the article's broader point was that the person who drove a Dodge Challenger into "antifa counter-protestors in Charlottesville" was a "left-winger," "not a right-winger or white nationalist." (ECF No. 12, PageID.468.) The attacker's political party has little to do with Michigan specifically. So the GotNews article was not tailored to a Michigan audience. Nor is there evidence that GotNews marketed or circulated the article to people in Michigan specifically as opposed to GotNews readers generally. And Nehlen's tweet was even one step (or one hyperlink) removed from the GotNews article. So aside from indirectly informing the public that Jerome lived in Michigan and that Joel had gone to high school in Romeo (and might be attending college at Michigan State), there was nothing "Michigan" about Nehlen's tweet. The Court will thus not require Nehlen, a Wisconsin resident, to defend the Vangheluwes' claims here.

The Vangheluwes point to additional facts. (*See* ECF No. 45, PageID.846–847.) They assert that Nehlen was running for one of Wisconsin's seats in the U.S. House of Representatives at the time of his tweet. (ECF No. 12, PageID.426.) And, the Vangheluwes claim, Nehlen "sent the defamatory message at issue through his Twitter account to his supports in Michigan to curry

17

favor with them and gain financial support for his campaign." (ECF No. 12, PageID.426.) In fact, the Vangheluwes point out, among Nehlen's contributions, the sixth most money came from Michigan. (ECF No. 12, PageID.427.) (This might be because Nehlen was formerly the director of SPX Corporation in Michigan and formerly lived in Michigan. (*Id.*))

These additional facts do not tip the personal-jurisdiction scale in the Vangheluwes' favor. While it is possible that Nehlen tweeted a link to the GotNews article to get contributions, it is also possible that Nehlen was merely posting something he was interested in or that he believed his supporters were interested in. But even granting the Vangheluwes their premise (that Nehlen's tweet was an attempt to raise money), there is nothing about Nehlen's tweet specifically targeting the pocket books of Michiganders. At bottom, the Vangheluwes' merely speculate that Nehlen's tweet was "to curry favor with" Michiganders. And speculation does not show that the exercise of personal jurisdiction over Nehlen is proper.

In short, Nehlen's tweet lacks a "[Michigan] focus," *Walden*, 571 U.S. at 288, that would subject him to suit in a Michigan court. Nehlen will be dismissed for lack of personal jurisdiction and the Court does not reach his defense under Rule 12(b)(6) and the Communications Decency Act.

### D.

Much of what was just said can be applied to Weikart. For convenience, here again is his tweet:



18

(ECF No. 91, PageID.1396; *accord* ECF No. 12, PageID.557.) All that is "Michigan" about that tweet is the statement that Joel is from Romeo, Michigan. But a reader of the tweet is immediately pulled from Michigan to Ohio (the license plate number) to Virginia ("#Charlottesville"). And Weikart's tweet was not about events that took place in Michigan. And nothing about the tweet suggests he was targeting a Michigan audience. True, Weikart may have known the harm from his tweet would be felt in Michigan. But that does not suffice to require Weikart to defend the Vangheluwes' claims in Michigan. He too will be dismissed for lack of personal jurisdiction.

### III.

For the reasons stated, the Court GRANTS Nehlen's motion to dismiss (ECF No. 35) and GRANTS Weikart's motion to dismiss (ECF No. 42). The Court DENIES Coulhart-Villanueva motion to dismiss (ECF No. 47) but she may again challenge the exercise of personal jurisdiction on a more developed record. As noted, the Court GRANTS the Vangheluwes' motion to file a sur-reply to Nehlen's motion (ECF No. 53).

SO ORDERED.

                                                                s/Laurie J. Michelson
                                                                 LAURIE J. MICHELSON
                                                                 UNITED STATES DISTRICT JUDGE

Date:  February 6, 2019

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 6, 2019.

                                                                 s/William Barkholz
                                                                 Case Manager to
                                                                 Honorable Laurie J. Michelson